COCHRAN et al. v. MUTUAL LIFE INS. CO. OF NEW YORK.

(Circuit Court, D. Oregon. February 24, 1897.)

No. 2,230.

LIFE INSURANCE—SUICIDE—BURDEN OF PROOF—SUFFICIENCY OF EVIDENCE.

Insured was found dead in the family spring, with a hole in the back of his head, from a bullet fired from a pistol in his own hand. He had been accustomed to take his pistol with him to the spring to shoot squirrels, which, by digging, interfered with the water supply. Plaintiff, as part of her proofs of death, presented the coroner's verdict of suicide, and stated as the cause of death, "supposed to have suicided." Assuming that this placed on plaintiff the burden of showing that the death was not by suicide, *held*, that on the facts, including want of adequate motive, absence of powder stains, and the probability that deceased may have leaned over the spring to look for holes,—holding on by a door behind him, with the cocked pistol in his hand,—the jury were warranted in finding that death was accidental, and returning a verdict for plaintiff.

This was an action at law by Martha A. Cochran (now Martha A. Calloway) against the Mutual Life Insurance Company of New York, upon a policy of insurance on the life of her husband. The jury returned a verdict for plaintiff, and defendant moved for a new trial.

Geo. E. Chamberlain, J. W. Whalley, and J. K. Weatherford, for plaintiffs.

Bronaugh, McArthur, Fenton & Bronaugh, for defendant.

BELLINGER, District Judge. This is an action upon a policy of insurance upon the life of Cochran. The jury returned a verdict for $5,000, the amount of the policy. Cochran was found dead in a spring near his house, from a pistol shot in the back part of his head, fired from a pistol in his own hand. A coroner's jury found that the deceased committed suicide, and the widow, in submitting proofs of death, attached a copy of the findings of the coroner's jury, as she was required to do by the form of proof provided for her by the company, and stated as the cause of death, "Supposed to have suicided with a pistol." It is claimed in support of the motion for a new trial that this answer put the onus upon the plaintiff of explaining this statement, and of showing that the deceased did not commit suicide, and that as to this there is a failure of proof. It is held that representations made in the proof of death as to the manner of the death of the insured are intended for the action of the insurance company, and upon the truth of such representations the company has a right to rely, and that the party making such representations must be held to them until it is shown that they were made under a misapprehension of the facts, or in ignorance of material matters subsequently ascertained. I assume that the statement in the proof of death that the deceased was "supposed" to have committed suicide, although not the representation of the manner of death, but of a current theory in respect to it, has so far the effect of such a representation, inasmuch as it was intended for the action of the company, as to justify the company in relying upon the assumption that the deceased committed sui-

cide, and put the burden upon the plaintiff of showing that the manner of death was otherwise; and the question therefore is, do the facts in evidence warrant the conclusion reached by the jury that such representation was not true, and that, contrary to it, the deceased was killed by the accidental discharge of his own pistol?

The evidence tended to show that the supply of water for the domestic and farm uses of deceased was from a large spring near the dwelling house; that it was the dry season of the year; that squirrels had been digging holes beneath the spring, in such a way as to cause loss of a part of the water therefrom, and consequent inconvenience to the deceased and his family, from lack of water; that deceased had been in the habit of taking his pistol and visiting the spring to shoot these squirrels; that on the morning of his death he went to the spring, having the pistol with him (this was before breakfast); that, when breakfast was ready, Mrs. Cochran called to her husband, who responded to the call, and came and ate his breakfast with the family; that after breakfast he returned to the spring, having the pistol with him, as was his habit; that shortly thereafter a pistol shot was heard in that direction, and, upon investigation, deceased was found floating in the spring, face downward, dead, with a large bullet hole behind the right ear. The bullet had passed through the temporal bone and into the brain, ranging slightly upward and transversely through the brain, lodging there, according to the testimony of the physician who conducted the post mortem examination. Other witnesses, who were present and saw the wound probed, testify that the bullet ranged downward and forward, so that it would have come out at the lower end and in front of the left ear, had it passed through the head. The wound was a ragged, irregular one,—large enough to admit the index finger of the physician who conducted the post-mortem examination. The spring is inclosed in cement walls 5 feet high. It is 9 feet square, and at the time in question it had a depth of water of about 3 feet. Over this is a spring house, built of wood, 6 feet high at the cone of the roof from the top of the cement wall. The door is at the edge of the spring, and is about 2½ feet high, and of about the same width. The bottom of the door opening is the top of a sill some 3 or 4 inches above the ground. There was some testimony tending to show powder stains or marks at the surface of the wound, but the preponderance of the evidence was against any indication of powder burn upon the skin or hair of deceased, the wound being at a point just in the edge of the hair. There was nothing unusual in the conduct of deceased prior to his death. He was a sufferer from stomach ailments. His son George admitted that he had testified at the coroner's inquest that deceased told him he would kill himself if he did not get over his stomach trouble; but the witness testifies that he was much excited at the time, and did not know all that he testified to, and that now he has no recollection of such a statement by deceased. The financial circumstances of the deceased were good, although there was an attempt to show that he was involved over his business matters, and was in mental worry on such account. One of these matters involved a friend

to whom he had given a check for $600, and who was in danger of losing the money through failure of a bank, other than the one on which the check was drawn, where he had placed the check for collection. The deceased was in no way involved in the transaction. The other business matter grew out of a note indorsed by deceased, with a number of other persons, for the Albany Woolen Mill. The note was for a large sum, but the woolen mill was solvent, and there was no ground for apprehension on that account. Moreover; all the other indorsers were men of recognized financial ability. The burden put upon the plaintiff by the representation of suicide as to the manner of death in her proof of death makes the case one where she must show that her husband did not purposely kill himself. Do the facts warrant such a conclusion? It does not necessarily follow from the facts which the evidence tends to establish, but this is not required. The nature of the case necessarily leaves the question uncertain. It is enough if, by a process of reasoning, such a conclusion becomes probable. Were there such facts, therefore, in evidence as warranted the jury, in the exercise of their right to judge of the credibility of the witnesses and of the weight to be given to their testimony, in the conclusion, upon the probabilities of the case, that the deceased did not commit suicide? In discussing the facts, much was said as to the testimony bearing upon the question of powder marks and burns upon the skin and hair of the deceased. There was testimony tending to prove that there was no indication of powder burn about the wound, and the jury might properly arrive at that conclusion. From such a conclusion it seems probable that the pistol from which the shot was fired was held at some distance from the head. This may be called one of the phenomena in the case, and it points to an accidental rather than an intentional shooting. The difficulty of firing such a shot, and the uncertainty of aim which it involves, makes it improbable that such a shot was intentional. The position of the body at the time the shot was fired is inexplicable upon any other theory than that of an accidental shooting. The deceased was necessarily leaning so far over the spring that the body fell entirely within it. There is nothing to explain such a posture in a premeditated shooting. It is doubtful if such a position could be maintained under such circumstances; and, if it could, did the deceased intend in this way to provide two methods of self-destruction,—to drown himself if his pistol failed? It was within his power, by placing the muzzle of the pistol against his head, to avoid any possible chance of a miscarriage in that method of suicide. Why a second method? And would the spring which was the source of his family supply of water be chosen for such a purpose? The habits and instincts of men are against such a hypothesis. The theory of the plaintiff is much more reasonable, and it is consistent with the known facts. Deceased had been in the habit of visiting this spring, sometimes with his pistol, sometimes with a rifle, and shooting squirrels there. He had already made such a visit before breakfast on the morning of his death. These animals had dug holes about there, and these had a tendency to draw off the water from the spring, already low and

insufficient. It is not improbable that he would cock his pistol on approaching the spring, and carelessly proceeded to inspect the interior of the spring after getting there, without thinking of the condition of his pistol. In examining for squirrel holes that might exist under the cement wall, he would naturally lean over the spring, and in so doing he would quite as naturally grasp the side of the low doorway near him. It is not improbable that he would do this with the pistol still in his hand. As he leaned forward over the spring, examining its interior,—unmindful, in his interest in what he was doing, of any danger,—the pressure of his weight on the hand by which he was supporting himself probably discharged the pistol while the arm holding it was extended at its full length, or nearly so. This explains those features of the case not otherwise explainable, and yet necessary to be explained in determining the question at issue. All minds may not agree as to the deductions thus drawn from the facts in evidence, but if the jury made these deductions, as they must have done, the court cannot, upon any argument of a different conclusion, overrule them and set their verdict aside. The motion is denied.