ANNIE VAN NORMAN, Appellee, v. MODERN BROTHERHOOD OF AMERICA, Appellants.

**Mutual insurance:** INSANITY: SUICIDE AS A DEFENSE: EVIDENCE.
1 There is a legal presumption in favor of the sanity of every person, which obtains until overcome by competent evidence; and the burden of establishing insanity is upon the one asserting its existence. In the instant case the issue of sanity of a member of a fraternal benefit society at the time of his death, material under the contract as bearing upon the question of suicide only, is held to present a question of fact for the jury and not one of law for the court.

**Suicide:** PRESUMPTION AGAINST: EVIDENCE. In the absence of direct
2 proof as to the manner of death, if the circumstances leave any room for doubt upon the question, the law presumes that it was accidental; or the result of natural causes, and not suicidal. In the instant case the evidence as to the manner of death of a member of the defendant society presented a question of fact for the jury.

**Same:** EXPERT EVIDENCE. The manner and method by which an in
3 jury was inflicted is not ordinarily the subject of expert testimony; and the opinion of experts upon that question is entitled to little if any greater weight than that of nonexperts of average experience and judgment.

**Evidence taken on former trial:** ADMISSIBILITY. The testimony of
4 a witness on a former trial, which was properly preserved in the official report and duly certified, may be read in evidence on a subsequent trial of the action without showing that the presence of the witness was not obtainable.

**Evidence:** EXCLUSION: HARMLESS ERROR. The exclusion of evidence of a fact which is established by other competent proof is harmless error.

**Instruction:** WEIGHT TO BE GIVEN CIRCUMSTANTIAL EVIDENCE. An instruction with reference to a consideration of circumstantial evidence, that the several facts and circumstances must be so connected, each with the other, that when taken together and considered as a whole they establish in the minds of the jurors the truth of the facts in controversy, is correct; and such in effect is the instruction given in the instant case when correctly interpreted.

**Same.** An instruction to the effect that the main fact to be proven is sufficiently established when all the other proven facts and circumstances taken as a whole are inconsistent with any other reasonable hypothesis, is correct, and not open to the objection that it required a finding that each separate fact be inconsistent with any other reasonable hypothesis.

**Same:** MUTUAL INSURANCE: DEFENSE OF SUICIDE. In this action the court recited in his instructions certain facts which defendant sought to establish in support of its defense of suicide, as invalidating its policy, and then charged the jury that if found to be proven and to be consistent only with the theory of suicide a verdict should be returned for defendant. *Held,* not subject to the objection that the jury was required thereby to find that each and all of the alleged facts had been established before the conclusion of suicide was justified.

**Suicide:** PRESUMPTION: INSTRUCTIONS. The fact that deceased may have been suffering from slight ailment affecting his mind, or may have been affected with mental unsoundness in some slight degree at the time of his death, was not sufficient to overcome the presumption against suicide, but was proper for the consideration of the jury on that issue.

*Appeal from Linn District Court.*—HON. MILO P. SMITH, Judge.

FRIDAY, JULY 2, 1909.

ACTION at law upon a certificate of life insurance. Verdict and judgment for plaintiff, and defendant appeals. —*Affirmed.*

*Grimm & Trewin,* for appellants.

*Voris & Haas,* for appellee.

WEAVER, J.—The defendant is a corporation engaged in the business of life insurance upon what is known as the fraternal or assessment plan. On or about November 22, 1897, David W. Van Norman became a member of the organization and received therefrom a certificate entitling his wife, Annie Van Norman, to the sum of $2,000 upon his death, subject to certain expressed conditions. Said Van Norman maintained his membership in good standing, paying all dues, assessments, and charges against him until about January 1, 1905, when he died from the effects of a gunshot wound. On proper proofs of his death being made, the defendant refused to pay the promised indemnity on the ground that the deceased came to his death by suicide, and the terms of the contract of insurance did not cover such a loss. This action was thereafter begun at law upon the benefit certificate. On motion of the defendant the cause was transferred to the equity calendar for trial and a decree entered dismissing the action. On appeal to this court that decree was reversed and the cause remanded for trial as a law action. *Van Norman v. Brotherhood,* 134 Iowa, 575. On retrial in the district court, there was a verdict and judgment for plaintiff, from which the present appeal is taken.

The provisions of the contract relied upon by the defendant are as follows: The application of the deceased upon which he was admitted to membership contained the following clause: "I further agree that in the event of my death by suicide, whether sane or insane, any certificate that may be issued upon this application by said fraternity shall become void." In the certificate upon which suit is brought there is also the following: "Third. If a member holding this certificate . . . shall die in consequence

of a duel or by his own hands, whether sane or insane, . . . then this certificate shall be null and void, and of no effect, and all moneys which shall have been paid, and all rights and benefits which may have accrued on account of this certificate shall be absolutely forfeited. . ."

I. The validity of this condition of the defendant's liability is not denied and the principal controversy is therefore reduced to the simple proposition of fact: Did

1. MUTUAL
INSURANCE:
insanity:
suicide as a
defense:
evidence.

the deceased commit suicide? It is the position of the appellant that the evidence upon this point is so overwhelming and without conflict that the court should have directed a verdict in its favor. David Van Norman was by trade an upholsterer, and had also spent some years in railroad service, but during the latter part of his life had been acting as a solicitor of life insurance in the employment of the Fraternal Bankers' Association. His average ordinary weight was about one hundred and sixty to one hundred and sixty-five pounds, and at the time of his death he weighed one hundred and fifty-five pounds. For several years prior to his death he suffered to some extent from stomach trouble, the nature of which is not well defined, and for the last few months had been treated with more or less frequency by a physician. The extent of this ailment, its effects upon him, and whether he was otherwise suffering from any abnormal condition of body or mind is the subject of considerable conflict in the testimony. As to the situation of his home and the circumstances surrounding his death, we adopt, in part, the statement of facts in appellee's brief, as they seem to have support in the record. It is perhaps more extended than is really necessary, but, the question at issue being one of fact, it is well to have the situation pictured with considerable minuteness of detail.

At the time of the death of David Van Norman,

he and his wife were living in the house of his parents on C Avenue in Cedar Rapids. The sister of David was the wife of John Gadbois, whose home was next door west of the Van Norman home. David and his wife and a twelve year old son had been living with his parents in their home for three or four years. C Avenue runs east and west, and these two homes are on the south side of the avenue. The two homes were on the same lot, and only ten or fifteen feet apart; Van Norman's being on the east. The front door in each opens directly into the parlor, the parlor extends across the front of the house, except a bedroom on the east, the parlor being the northwest corner of the house, and the bedroom directly east of it. Immediately back of the parlor is a sitting room, and east of that is a small bedroom, which, in the Gadbois home, was also sometimes used for and designated as a bathroom. Back of the sitting room is the kitchen, which extends along the back of the house. In going back and forth between the two houses the family used the back way. There were porches on the west of the kitchens. David Van Norman during the time he and his family lived in the Van Norman home occupied the small bedroom on the east of the sitting room corresponding with the so-called bathroom in the Gadbois home. There was an ordinary door between the sitting room and bathroom, but it was never closed. There was no closet in the bathroom—just a tub. A stairway begins at the northeast corner of the bathroom. There was a chiffonier standing between the stair door in the bathroom and the door between the bathroom and the sitting room on the north side, right back against the wall. This chiffonier just took the space between the two doors. There was another door opening from that bedroom into the front bedroom. There was a single bed in that room in the southeast corner against the two walls. The bath tub was right back of the door against the west and south wall. There is a window opposite the door that faced the Van Norman house, and in front of this window a sewing machine stood. This bedroom is about eight feet east and west and ten feet north and south. There was one commode in the room between the single bed and the bath tub up against the south wall of the room. There

was a closet under the stairway, on the west side. The only light in this bathroom was the one window opposite the door leading to the sitting room. This so-called bathroom was kept as sort of extra bedroom, and was used by the Gadbois family as a bathroom. In the commode on the south side of the room they had lots of stuff for kodak purposes—developing pictures, plates and stuff like that. On the top of the chiffonier were kept fancy things. The firearms of the house consisted of two shotguns and a rifle, and were kept right in the northeast corner of the bathroom back of the stairway door that leads upstairs. There was nothing else in that corner. One shotgun belonged to Mr. Gadbois, and the rifle and smaller shotgun belonged to Mrs. Gadbois. The rifle was a single shot, breach-loading, twenty-two-caliber rifle, and would shoot either a twenty-two short or a twenty-two long. Mrs. Gadbois had not personally used this rifle for three months. She always kept the barrel properly cleaned in good shape, and the entire gun in good working order and in good condition. The smaller shotgun belonging to Mrs. Gadbois was a sixteen-gauge breech-loading shotgun, the other shotgun was larger, and had been used the last time by Mr. Gadbois. It was the practice and custom of the Gadbois and Van Normans to clean all guns and oil them up properly, and put them away in good condition after using them, and to leave them unloaded. David Van Norman had been in the habit of hunting a great deal for a great many years, and enjoyed the sport very much. He was somewhat of an enthusiast in reference to guns, and was perfectly familiar with their use and with the different makes. He had a rifle of his own, the exact pattern of a twenty-two-caliber owned by Mrs. Gadbois, and kept it at his father's home, and had had that rifle for seven or eight years. He had used it a great deal. David Van Norman and Mrs. Gadbois were in the habit of practicing together with these rifles at target practice. They used to go hunting together, and used these rifles at such times. Ammunition was kept in the Gadbois house for each of these shotguns and for the rifle, and was kept in this bathroom. The cartridges for the rifle were in a little pouch that was carried in a hunting belt, and was hung up on one of the hooks over

the bath tub in this bedroom. There was a special pocket for the purpose of carrying ammunition. They had used it when hunting with David Van Norman. It was not the custom or habit of the Gadbois family or of David Van Norman or his wife to keep a gun loaded about the house. The shells were always removed. The only gun that David Van Norman had was the rifle, and it was a duplicate of the one owned by Mrs. Gadbois. He used the rifle altogether. During the three or four years that the families lived in adjoining houses on C Avenue, the two guns, namely, the shotgun and the rifle, of Mrs. Gadbois, and also the shotgun of John Gadbois, were owned by the parties, and John Gadbois also owned a revolver. They all used these guns frequently, and David especially enjoyed the sport with the gun. The cartridges for the shotguns hung right over the bath tub on the west wall, usually in John Gadbois' hunting vest, in the place for shells upon the vest. These shells were kept in there, and hung there right along, and had for a good many years.

On the night of December 26, 1904, five days before the death of Van Norman, this twenty-two-caliber rifle belonging to Mrs. Gadbois, and which was set in the northeast corner of the bedroom in which the bath tub was, and which Van Norman had frequently handled and knew was always kept clean and unloaded, was loaded with a twenty-two short, smokeless powder cartridge by John Gadbois for the purpose of shooting a cat that was annoying them in the night. Gadbois got out of bed and loaded the rifle and went out, but did not get a shot at the cat. He returned to his room, and, thinking that the cat might come back and that he would yet get a shot, he set the rifle down in its accustomed place, leaving the cartridge in the gun. He returned to his bed, but hearing some engines whistling down in the railroad yards, and being the foreman in the shops, he remarked to his wife that a train was going out, and that he had better go down and see about it. He went away and was gone for an hour or more, and then returned home and again retired. He

had forgotten about leaving the rifle loaded and the cartridge was permitted to remain therein, and no one handled the gun after that until the time of the death of Van Norman. On New Year's morning, 1905, Mrs. Gadbois called upon the deceased and invited him to her home. Soon after he went to his sister's house, entering by the back door. Except these two there was no other person about the premises. For an hour or two they were visiting and talking upon miscellaneous topics. They spoke of the holiday and of the preparations for dinner. He amused himself investigating his sister's fancy work, and examined some kodak negatives and pictures. Nothing in his language, appearance, or manner attracted her attention as being anything unusual. About eleven o'clock Mrs. Gadbois, not having finished her morning work, went to the rear of the house on some errand, leaving David busied with a magazine, and was gone about twenty-five minutes. Before returning, she heard a sound which she attributed to the slamming of a door. Coming back to the room where she had left her brother, he was not in sight, and, looking around for him, she found him lying with his head to the stairway door, his feet extended in front of the chiffonier. The rifle lay between him and the bed in front of the window, but the witness does not remember how it was pointed. It did not lie across his body. He was motionless when discovered, but still living, though he died very soon thereafter. There was blood on his face, but witness did not at first see the wound, and later it was found that the bullet had entered the right temple. It had not passed through the head, and there was no post mortem examination to trace definitely the course of the wound.

In addition to the foregoing matters which for the most part are not the subject of dispute, the defendant supported its defense by evidence tending to show that some months prior to his death a change was apparent

in both the physical and mental characteristics of the deceased; that his health failed to a considerable degree; that he was depressed in spirits, pale, and nervous, and expressed a feeling of discouragement over the prospects of recovery from his illness, and worried about his doctor bills and assessments. It is also claimed that the skin of the deceased about the wound was not burned or marked by powder, and that the wound was made by a shot fired at right angles with the temple. One witness testified that in his opinion deceased was mentally unbalanced several weeks before his death. Expert witnesses for the defendant also testify that the stomach trouble which deceased was suffering tends to bring about a condition of nervous prostration, under the influence of which the patient often commits suicide; that in a majority of suicides by the use of firearms the fatal wound is made in the temple; that the absence of powder burns or powder marks upon the deceased can be explained only upon the theory that, when fired, the muzzle of the gun was held tightly to the temple. To rebut this showing, the plaintiff offered evidence tending to show that, while the deceased was the subject of some chronic ailment of the stomach, he was not seriously ill; that he was little if any reduced in flesh; that during the last eight weeks of his life while taking medical treatment he was not confined to his house; that during that period he attended a lodge meeting, taking part in the discussions had among the members; that he was down town after Christmas; that he was not in debt; carried a bank account up to the date of his death, and had no domestic trouble; that he was fond of music, and was taking vocal lessons and practicing up to the last; that there was no visible change in his manner, deportment, or facial expression; that he was jovial and lively and ate a good breakfast on the morning of his death. Concerning the fact as to powder burns or powder marks about the wound, members of

the family say the temple of the deceased when discovered was discolored with blood, and they did not notice other marks... The physician first arriving at once covered the wound and the immediate surface about it with a pad saturated with argyrol, the effect of the application being to immediately stain the skin. He did not examine as to powder marks, and he testifies that, if such marks had been there, they would have been obliterated or covered up by the stain of the argyrol. The same witness testifying as an expert says the skull at the point where the wound was found is very thin, and would be easily pierced by a bullet even if the gun be not held at a right angle to the temple, and that there was nothing in the external appearance from which to draw a conclusion as to the angle or direction of the line at which the bullet entered the head.

The question of the sanity or insanity of the deceased is, of course, not decisive of the case, for suicide, whether sane or insane, was sufficient to avoid the insurance. It is, however, of material weight and aid in determining the vital inquiry whether the deceased did commit suicide; it being a matter of universal knowledge that insanity in some of its forms at least frequently leads its victim to self-inflicted violence. Whether Van Norman was of sound or unsound mind at the time of his death was very clearly a question for the jury. The law presumes every person sane, and casts the burden of establishing insanity upon the party who asserts its existence, and it is very certain that the showing made in this record is not such as to justify us in holding as a matter of law that the presumption of sanity has been overcome by the defendant.

We have then to ask whether, assuming the deceased to have been sane, the circumstances of his death point so clearly and conclusively to the theory of self-destruction that the court should hold that the defense of suicide

has been established as a matter of law. We do not so

2. SUICIDE: presumption against: evidence.

find. In the absence of direct proof as to the manner of death, if the circumstances leave any room for doubt upon the question, the law presumes that death is accidental or from natural causes, and not suicide. This principle is too elementary to require citation of authorities. In the case before us, there is no room for doubt that David Van Norman died from a gun shot wound in the head, or that the bullet inflicting the wound was fired from the rifle which had been standing in the corner of the room where his body was found. But, when we attempt to go further and answer the question whether the shot was fired and the wound inflicted by the voluntary act of the deceased, and with suicidal intent, there is room for doubt, and that doubt must be solved in the ordinary way by the triers of fact from the circumstances developed in evidence. Starting with the presumption against suicidal purpose the story of the morning of the tragedy up to the discovery of the unconscious body of the deceased, the theory of accident finds some support in many of the attendant circumstances. Had he been contemplating suicide by shooting, he had similar weapons in his own home where he could have accomplished his purpose in the retirement of his own room. His going to the home of his sister is fully accounted for, not only by the intimate relation of the families and their close proximity of residence, but by her express invitation extended on that morning. His cheerful and natural manner, the interest manifested by him in his sister's work, and the usual homely topics of conversation tend (though of course not conclusively) to negative the thought that he was harboring the purpose of immediate self-slaughter. His presence in the room where the rifle was kept was not strange in view of the showing made that he, his sister, and brother-in-law were all greatly inclined to

field sports, and especially shooting, that their guns were nearly always a subject of discussion when they met, and it was his habit when visiting his sister to go into the room where the weapons were kept, and handle and inspect them. · If it be true, as claimed by defendant, that he was suffering from some degree of restlessness or nervousness, it would not be an unnatural thing if, when Mrs. Gadbois left the room and did not immediately return, he tired of the magazine she had given him, and, with the freedom of a brother in his sister's home, went into the room, and, as · was his wont, amused himself with the guns. The theory of accident is materially strengthened by the fact that it was their universal custom to remove the cartridges from the guns after using them, and leave them unloaded while in the house. So far as shown, he had no reason to suspect that this gun was loaded. This would tend to throw him off his guard, and lead him to omit that caution in handling the weapons which as an experienced person he would have otherwise exercised. Assuming these circumstances to be as claimed by plaintiff, and as the jury were justified in finding them to be, it is more natural to believe that in some manner in handling a weapon, which he had reason to believe unloaded and harmless, it was discharged without suicidal intent. Just the manner in detail in which it was done can never be known, but that statement is equally true of thousands of fatal injuries where there is to the ordinary mind no suggestion of suicide.

Expert opinion as to the nature and results of a physical injury is and always must be of great value where a determination of those facts becomes material, but, when the expert undertakes to describe the manner in which the injury was or must have been inflicted, his opinion borders upon the realm of guesswork, and is little if any better than the opinion of the nonexpert of average experience and judg-

3. SAME: expert evidence.

ment.   For instance, · if an expert testifies that because
a bullet enters a person's temple penetrating the skull,
instead of glancing therefrom, the gun must therefor have
been held at right angles to the temple, the jury is justi-
fied in taking such testimony with a great degree of al-
lowance, and bringing to bear upon the problem their own
common sense and knowledge and observation which are
common to all persons of · average opportunity and ex-
perience.   In the very nature of things the particular
manner and method by which an injury has been in-
flicted cannot ordinarily be the subject of expert testi-
mony.   It is true that many of the circumstances testified
to on the part of the plaintiff are opposed by testimony
of an opposite tendency by the defendant's witnesses,
and that there is also testimony of statements and ad-
missions by some of the plaintiff's witnesses which serve
to weaken the force and effect of the story told by them
on the witness stand, but all this demonstrates that the
proposition to be determined requires the examination
and weighing of evidence, and is therefore a question for
the jury.   There was no error, therefore, in the refusal
of the trial court to direct a verdict.

II.   On the first trial of the cause in the district
court the testimony of one James Bird was taken on part
of the plaintiff, and his testimony preserved in the offi-
cial report of the trial, which was duly

**4. Evidence
taken on
former trial:
admissibility.**
certified.   On the last trial, plaintiff of-
fered and read in evidence the testimony
of this witness from the notes of his former examination
to which the objection was made that there was no show-
ing that James Bird was not obtainable as a witness in
person so as to give opportunity to defendant for full
cross-examination.   This objection was overruled, and eror
is assigned on the ruling.   In this exception appellant
relies on *Lanza v. Quarry Co.,* 124 Iowa, 662.   The point
is not well taken.   In the *Lanza* case the witness was

present in the courtroom where he could have been called in person to the witness stand, and we held that, under such circumstances, the written report of his testimony was not admissible. In the case at bar, there is no pretense that the witness was present, but the objection proceeds upon the theory that plaintiff should have shown that his presence was not obtainable. The statute does not so provide, and we have expressly held that, if the witness be not present in court, the report of his testimony on a former trial of the same issue can be used. *Fitch v. Traction Co.*, 124 Iowa, 665.

A part of the cross-examination of the witness Bird as shown by the record of his testimony was excluded upon the objection of the plaintiff that it was not relevant to his direct evidence, and was mere hearsay and immaterial. We have examined the record in this respect, and find no substantial error. So far as the matter sought to be elicited was competent, it appears in substance in other parts of the record, while much of it is clearly hearsay.

5. EVIDENCE: exclusion: harmless error.

III. With reference to the consideration of circumstantial evidence, the court told the jury that "circumstantial evidence is just as competent and just as satisfactory as direct evidence when each link in the chain is connected with the one preceding and the one following, and, when taken together, make a complete whole. Indeed, it may be a more satisfactory way of accounting for certain results than direct evidence, especially when all the facts and circumstances taken together unite to establish a given proposition, and are all connected with each other and with such proposition, and are inconsistent with any other reasonable hypothesis." This is said to be erroneous because it requires the jury, in order to find the fact of suicide, to first "find that each bit of testimony was properly linked and connected with each other bit of testi-

6. INSTRUCTION: weight to be given circumstantial evidence.

mony" and because it lays down the rule that each separate fact and circumstance must be consistent with each of the others and inconsistent with any other reasonable hypothesis. If counsel's construction of the paragraph is correct, the objection has substantial foundation; but the language of the court does not fairly bear the interpretation placed upon it. The "link and chain" metaphor made use of by the court is a familiar one, yet, like most figures of speech, its effectiveness may be impaired by a too literal construction. So far as the first sentence in the above quotation is concerned, it means no more than that the several facts and circumstances making up the array must be so "linked"—that is, must be so connected each with the others—that, when taken together and considered as a whole, they establish in the minds of the jurors the truth of the particular fact or facts in controversy. This we think is not open to just criticism, for, if any one of the facts relied upon has no connection with the others— that is, if it in no manner unites with the others to strengthen or complete the inference sought to be established—it is of no value, and should be given no consideration.

So, too, when we turn to the last sentence quoted, we do not find the court charging that each independent or separate fact must be inconsistent with any other reasonable hypothesis. On the contrary, the

7. SAME.

statement is that the main fact is sufficiently established when all the other proved facts and circumstances—that is, when taken as a whole—are inconsistent with any other reasonable hypothesis. This is the usual statement of the rule. *Stephenson v. Bankers' Life,* 108 Iowa, 637; *Tackman v. Brotherhood,* 132 Iowa, 64; *Kennedy v. Railroad Co.,* 90 Iowa, 754; *King v. Railroad Co.,* 115 Iowa, 133; *Ashbach v. Railroad Co.,* 74 Iowa, 248.

In so far as the instruction here given tells the jury

that under certain conditions circumstantial evidence is more satisfactory than direct, it is probably unduly favorable to the defendant as the weight of the testimony whether direct or circumstantial is for the jury alone.

In this same paragraph, the court recited certain facts which defendants had sought to establish by the evidence, and charged the jury that, if found to be proven

8. Same: mutual insurance: defense of suicide.

and to be consistent only with the theory of suicide, a verdict should be rendered accordingly. The objection made to this clause is that the jury were required to find that each and every one of the alleged facts had been established before the conclusion of suicide would be justified. As we read this instruction, it is not to be so narrowly construed. It does call attention to the more prominent claims of the defense as to the effect of the evidence, and tells the jury that, if established and it cannot reasonably be reconciled with the theory of accidental death, the plaintiff cannot recover. While the statement embodied several matters, it is evident that the court was speaking distributively as well as collectively, and the meaning which counsel find in his words is not one which the jury would naturally place upon them. The practice of embodying in an instruction a recitation of facts on which a party relies is not to be encouraged because of the tendency to thereby unduly magnify the importance of the matters thus selected for specific mention, but the error, if any, in this instance, was one of which the plaintiff rather than the defendant was entitled to complain.

IV. Having stated to the jury the general presumption against the theory of self-destruction, the court proceeds to say that the verdict upon this proposition.

9. Suicide: presumption: instructions.

should be for the plaintiff, unless they found that this presumption and the testimony, if any, supporting it, had been overcome by the showing on the part of the defendant. On the same sub-

ject the defendant requested the court to charge that if deceased "was suffering from an ailment that affected his mind, however slightly, then there is no presumption that he did not commit suicide on that occasion and when in that condition." Another request was presented to the effect that, if on the date of his death he was "suffering from mental derangement or unsoundness of mind, there is no presumption that he did not commit suicide." Both of these requests were refused. The objection to these instructions as given and to the refusal of the requests is embodied in the language of the counsel just quoted; that is, if the deceased had any ailment affecting his mind "however slightly," or was suffering from mental unsoundness in any degree, the presumption against suicide does not obtain. Stated as broadly as put by counsel, this is not our view of the law. There are many varieties, phases, or degrees of mental unsoundness. It is not, we believe, an established or admitted fact that persons in all phases or degrees of mental unsoundness have a tendency to suicide. Such persons are, of course, to a greater or less degree moved to acts and conduct of an abnormal or unnatural character rendering their peculiar condition a material and proper fact for the jury upon the question of suicide, but to say that in every instance the ordinary presumption shall be given no weight, is a rule which we are unwilling to sanction. In the case of *Stephenson v. Bankers' Life,* 108 Iowa, 637, the deceased had been an inmate of the hospital for the insane, but, being somewhat improved, he was permitted to return home, where he had been but a few hours when he procured a revolver and went to the barn. The sound of a shot followed very soon, and he was found dying with a bullet wound in his head. An instruction by the trial court that the killing was presumed to be accidental was approved by this court saying: "While some of the circumstances point to self-destruction, yet we cannot say the evidence

is sufficient to overcome the presumption of accident.". In the cited case the evidence in the plaintiff's favor was by far less persuasive than is disclosed by the circumstances of this case even on the showing made by defendant.   Indeed, the showing of mental aberration in the deceased is to say the very least weak and inconclusive—so much so that, if the jury had returned a special verdict finding the deceased to have been insane, it would be difficult to justify it from the record.   Under the record made, it would have been error for the trial court to refuse the plaintiff the benefit of the presumption against suicide or to give an instruction which would permit the jury to disregard it.

V.   Other questions argued by counsel are of a nature to be controlled by the conclusions announced in the preceding paragraphs of this opinion.   There is no reversible error in the record, and the judgment of the district court is therefore *affirmed*.