## MUTUAL LIFE INS. CO. OF NEW YORK v. HATTEN.

(Circuit Court of Appeals, Eighth Circuit. February 21, 1927.)

No. 7515.

1. **Insurance ⊜➝646(8)—Under policy providing for additional payment for death from accidental means, burden held on beneficiary to show that insured shot himself accidentally.**

Under policy providing for additional payment in case of death from accidental means, beneficiary has burden of showing that insured shot himself accidentally, which need not be proved by direct evidence, but may be proved by proper inferences and presumptions from facts.

2. **Insurance ⊜➝646(7)—It is presumed that death was not result of suicide.**

Presumption is that death was not result of suicide.

3. **Insurance ⊜➝646(6)—Under evidence showing that insured was killed by external and violent means, it is presumption that death was caused by accident.**

Where evidence showed that insured was killed by external and violent means, there is a presumption, when it is doubtful as to whether death was due to accident or suicide, that it was caused by accident.

4. **Insurance ⊜➝646(7)—Presumption against suicide of insured is rebuttable.**

The presumption, in case involving additional payment under policy for death because of accidental means, that death was not result of suicide, is rebuttable, and is to be weighed with all other facts and circumstances in evidence.

**5. Insurance** ⬅➡**668(12)—Ordinarily, whether deceased person committed suicide is for jury.**

Whether a deceased person committed suicide is ordinarily a question of fact for jury.

**6. Insurance** ⬅➡**668(12)—Evidence on whether insured committed suicide, as affecting recovery of additional sum under policy held for jury.**

In action for recovery of additional sum under policy, where death resulted from accidental means, evidence on question of whether insured committed suicide *held* sufficient to make question of accidental death one for jury.

**7. Trial** ⬅➡**142—Question is for jury, where evidence on fact matter is such that reasonable men may honestly reach different conclusions.**

Where evidence on a fact matter is of such character that reasonable men, in an impartial and fair exercise of judgment, may honestly reach different conclusions, question is for jury.

In Error to the District Court of the United States for the Southern District of Iowa; Martin J. Wade, Judge.

Action by Mamie C. Hatten against the Mutual Life Insurance Company of New York. Judgment for plaintiff, and defendant brings error. Affirmed.

R. L. Read, of Des Moines, Iowa (J. G. Gamble, of Des Moines, Iowa, on the brief), for plaintiff in error.

W. E. Mitchell, of Council Bluffs, Iowa, and A. V. Thornell, of Sidney, Iowa (Thornell, Thornell & Adams, of Sidney, Iowa, and Tinley, Mitchell, Ross & Mitchell, of Council Bluffs, Iowa, on the brief), for defendant in error.

Before LEWIS and KENYON, Circuit Judges, and TRIEBER, District Judge.

KENYON, Circuit Judge. Defendant in error was plaintiff in the trial court, and plaintiff in error was defendant. For convenience the parties will here be designated as in that court. Plaintiff was beneficiary in a certain insurance policy issued by defendant on the life of Charles M. Hatten, her husband, of Sidney, Iowa. Said policy provided for payment of $10,000 to the beneficiary in case of Hatten's death, and $10,000 additional if such death "resulted directly from bodily injury, received after the date of issue of this policy, independently and exclusively of all other causes, and that such bodily injury was effected solely through external, violent (annual premium $287.50), and accidental means, and that such death occurred within 60 days after the date of such bodily injury."

Charles M. Hatten was killed January 22, 1923, by a shot from a revolver held at the time in his own hand. Defendant has paid $10,000, the face value of the policy, and declines to pay the additional $10,000 for which this suit is brought, claiming that the death of assured did not result from bodily injuries effected solely through external, violent, and accidental means. The case was tried to a jury, resulting in a verdict for plaintiff for the $10,000. From judgment entered thereon, this writ is prosecuted.

At the close of the evidence, defendant moved for an instructed verdict on a number of grounds which are all embraced in the one general claim that the evidence was insufficient to sustain any finding that the death of decedent was brought about by accidental means. The one issue therefore before us for determination is: Did the court err in denying the motion for an instructed verdict for defendant, and in submitting the case to the jury?

That decedent shot himself, and that his death was the result of such external, violent means, is conceded; that he did so accidentally is plaintiff's theory; that he did so intentionally is defendant's theory. It is obvious that this is a question of fact. Ordinarily such question is for the jury. Does the record here bring this case under any exception to that general rule?

[1] The legal principles applicable to the situation presented are well established.

Under the terms of the policy, in order to recover the additional $10,000 as provided therein, the burden was on plaintiff to show that decedent shot himself accidentally. Travelers' Insurance Co. v. McConkey, 127 U. S. 661, 8 S. Ct. 1360, 32 L. Ed. 308; United States Fidelity & Guaranty Co. v. Blum (C. C. A.) 270 F. 946; National Masonic Acc. Ass'n of Des Moines v. Shryock (C. C. A.) 73 F. 774; Brunswick v. Standard Acc. Ins. Co., 278 Mo. 154, 213 S. W. 45; 7 A. L. R. 1213; Reynolds v. Maryland Casualty Co., 274 Mo. 83, 201 S. W. 1128. This does not mean that plaintiff must show the fact by direct evidence. It may be proved by proper inferences and presumptions from the facts.

[2] Plaintiff, in carrying this burden of proof, is aided by the well-established presumption that death was not the result of suicide. Jones v. Accident Ass'n, 92 Iowa, 652, 61 N. W. 485; Stephenson v. Bankers' Life Ass'n, 108 Iowa, 637, 79 N. W. 459; Travelers' Ins. Co. v. McConkey, 127 U. S. 661, 8 S. Ct. 1360, 32 L. Ed. 308; United States Fidelity & Guaranty Co. v. Blum (C. C. A.) 270 F. 946; Brunswick v. Standard Acc. Ins. Co., 278 Mo. 154, 213 S. W. 45, 7

A. L. R. 1213; Jenkin v. Pacific Mut. Life Ins. Co. of California, 131 Cal. 121, 63 P. 180.

In Michalek v. Modern B. of A., 179 Iowa, 33, 41, 161 N. W. 125, 129 (L. R. A. 1917E, 1060) the court, in referring to this presumption, said: "Even where, as in this case, there is direct evidence that the death was caused by a weapon in the hands of the deceased himself, the presumption still prevails; because, if nothing more than that is shown, there is still room for the hypothesis that his act in that regard may have been involuntary or accidental." See, also, Paulsen v. Modern Woodmen of America, 21 N. D. 235, 130 N. W. 231.

[3] Where the evidence shows that insured was killed by external and violent means, there is a presumption also, when the evidence is doubtful as to whether the death was due to an accident or to suicide, that it was caused by accident. Travelers' Ins. Co. v. McConkey, 127 U. S. 661, 8 S. Ct. 1360, 32 L. Ed. 308; Travelers' Ins. Co. of Hartford v. Melick (C. C. A.) 65 F. 178, 27 L. R. A. 629; Van Norman v. Modern Brotherhood, 143 Iowa, 536, 121 N. W. 1080; Wood v. Woodmen, 166 Iowa, 391, 147 N. W. 888; Green v. New York Life Ins. Co., 192 Iowa, 32, 182 N. W. 808; Kornig v. Western Life Indemnity Co., 102 Minn. 31, 112 N. W. 1039.

[4] The presumption against suicide is a rebuttable one, and is to be weighed with all other facts and circumstances in evidence, Howes v. Iowa State Traveling Men's Ass'n (D. C.) 241 F. 278, and, of course, cannot prevail where such facts and circumstances show a deliberate act of self-destruction. A sane person is presumed to intend the natural consequences of his act, and, if the evidence in a case shows that a party intentionally killed himself, then, of course, the presumption against suicide vanishes. If the circumstances, however, are consistent with any other reasonable hypothesis, that of suicide is excluded.

As said by Judge Faris (now an honored federal District Judge) when on the Supreme Court of Missouri, in Brunswick v. Standard Acc. Ins. Co., 278 Mo. 154, 173, 213 S. W. 45, 50: "Obviously, the presumption against suicide cannot continue to exist in the face of evidence showing suicide, for such a view would be utterly subversive of the well-settled doctrine, figuratively but strikingly announced by Lamm, J., substantially, to wit, that presumptions are the bats of the law, which the light of evidence frightens and causes to fly away." Neasham v. New York Life Ins. Co. (D. C.) 244 F. 556; New York

Life Ins. Co. v. Bradshaw (C. C. A.) 2 F. (2d) 457; New York Life Ins. Co. v. Weaver (C. C. A.) 8 F.(2d) 680; Von Crome v. Travelers' Ins. Co. of Hartford, Conn. (C. C. A.) 11 F.(2d) 350; Bridget Gavin v. Des Moines Life Ins. Co., 149 Iowa, 152, 126 N. W. 906.

[5] Whether a deceased person committed suicide is ordinarily a question of fact for the jury. Supreme Lodge, K. of P., v. Beck, 181 U. S. 49, 21 S. Ct. 532, 45 L. Ed. 741; Parrish v. Order of United Commercial Travelers (C. C. A.) 232 F. 425; Connell v. Traveling Men's Ass'n, 139 Iowa, 444, 116 N. W. 820; Fidelity & Casualty Co. of New York v. Egbert (C. C. A.) 84 F. 410. There is little to be gained by a review of the numerous cases; no two being alike.

Counsel for defendant in his brief states: "It is of the greatest importance that it be clearly recognized that, in the last analysis, this case presents primarily a question of the weight of evidence." With this statement we are in accord.

[6] The case is reduced to the question of whether the trial court as a matter of law should have held that the evidence was not sufficient to sustain any reasonable hypothesis of death by accidental means, and therefore should have directed a verdict for defendant. A determination of this question requires some review of the evidence. Decedent, Hatten, was 36 years old at the time of death. He was employed as manager and bookkeeper in the garage of one Esden in the city of Sidney, Iowa. Esden and he had been friends from boyhood. A discrepancy of approximately $7,000 developed in the books. Shortly prior to the day he shot himself, a new bookkeeper had been employed; Hatten remaining in a different capacity than he had formerly occupied. The new bookkeeper took over the books the morning of the day Hatten died. Hatten had offered to give Esden a note for $3,000 and a surety bond if Esden would continue him in the same position. Esden had experienced the same kind of discrepancy in the books of his place of business at Hamburg, a town not far distant from Sidney, and with which business Hatten had nothing whatever to do. Early in the morning of the day of Hatten's death, his wife gave birth to a child, apparently strong and healthy. His wife's mother was at the home all day, which home was owned by Hatten subject to some incumbrance. Hatten busied himself about the house, remaining away from his work all day, helping to make his wife comfortable, and doing odd work about the place, but being constantly

where he could assist in caring for his wife. He was cheerful and apparently happy over the new addition to his family. His mother-in-law cooked his supper, of which he ate heartily. He helped in removing the dishes from the table. After supper he waited on his wife, smoothed the pillows, gave her a drink of water; then evidently went upstairs and laid down for rest on the bed in the room where he was afterwards found dead. His mother-in-law, Mrs. Holloway, went upstairs to put woolen blankets on the bed and found him resting there. He helped her arrange the blankets. She saw no revolver in the room. There was nothing unusual about his appearance, except that he had his coat off. She told him she was ready to go home, and he said he would be down in a few moments to take her home. Shortly after Mrs. Holloway had returned to the downstairs, Mrs. Hatten asked her if she had brought down the cold cream. Mrs. Holloway then called upstairs to Hatten and told him the cold cream was in the bathroom and to bring it down, and he said he would. About 20 minutes thereafter Mrs. Holloway went upstairs, calling to Hatten that she was ready to go home. No response being heard, she opened the door to his room, and saw him lying on the bed, with blood on his face. No shot had been heard by any one. She returned immediately downstairs and gave the alarm. The coroner arrived shortly thereafter. Hatten's body lay partially on one side at the end of a three-quarter size bed which was against the east and north walls. A revolver was in his right hand, the first finger being through the trigger guard, the barrel pointing toward his head. There were in the gun one empty and one unexploded cartridge. The revolver gave conclusive indication of having been recently fired. The bullet had entered the edge of the socket of the left eye and traveled at an angle from the left to the right to a point beyond the right ear. Expert doctors testified that from the nature of the wound the revolver was at least 12 inches from the point of entrance of the bullet when fired, and one of the experts testified the revolver must have been hammer side down when fired. His reasons therefor seemed to be accepted by both sides to the controversy. The revolver had been owned by Hatten for some years. He kept it in a drawer of the chiffonier in the bedroom where Mrs. Hatten was confined. Some question arising as to the children finding the revolver, Hatten, according to his wife's testimony, told her "he had found their boy hunting at the chiffonier

for the gun and had taken the loads out of it." On the night he was killed, his wife saw him at this chiffonier as he was leaving it. She did not know his purpose in being there. The cold cream was found after his death on the chiffonier in the room where he was shot. There was also an unfinished cigaret burning. The testimony disclosed that the cylinder of the revolver spins without the usual ratchet catch. Hatten was a left-handed man. He enjoyed hunting, and in hunting shot with his left hand. The evidence shows he was a man of cheerful disposition, not subject to melancholia or worry. This résumé covers, we think, the important parts of the evidence.

Defendant insists the record presents positive and direct evidence that death was caused by intentional shooting; that the facts and circumstances rebut any theory of accidental shooting and sustain the hypothesis that he intentionally shot himself.

That there are indications in this case pointing to suicide cannot well be denied, viz. his being at the chiffonier, where the gun was ordinarily kept, just before going upstairs immediately preceding the shooting, the fact that some one had placed some cartridges in the gun, conceding he had unloaded it some time before as he had told his wife he had, the position of his body on the bed, his making no effort, as evidenced by his not putting on his coat, to take his mother-in-law home, his not coming downstairs with the cold cream for his wife. Naturally the queries spring to the mind: Why did he get the revolver? Why did he have it at that particular time? Why did he load it? If not he, who did load it and for what purpose? Why did he sit or lie down on the bed with a loaded revolver in his hand at a time when his wife expected him downstairs and his mother-in-law was waiting to be taken home? Are these circumstances so inconsistent with death by accidental means as to take the question from the realm of fact and make it one of law for the court? This cannot be determined without viewing the other side of the picture. There is generally a motive to be found for suicide. It is opposed to all natural instinct to take one's own life. "All that a man hath will he give for his life," has been the usual rule through all the ages, although there are always a few who believe that "to die will be a glorious adventure." There may be a suicidal intent lurking in a human mind not discernible by close association of relatives or friends. Business reverses, domestic difficulties, despondency born of discouragement, a wearying of the struggle for exist-

ence, brain fag, insanity, secret wrongs, fear of exposure, loss of honor, and various other kinds of trouble, have all been motives for suicide. It is impossible to understand the workings of the human brain or the reasons which impel human beings to take their own lives. Frequent, however, as suicide is becoming, it is the exception, and not the rule, and there still exists a strong presumption against suicide or suicidal intent. From this record it is apparent there could be no motive impelling Hatten to take his life, except possibly some fear of exposure as to defalcation or embezzlement on his part by an examination of the Esden books. The trial was some period of time after his death, and there was no showing at the trial of any wrong on the part of Hatten in his management of the Esden business. Certainly there was not sufficient motive in this discrepancy in the books for him to take his life. It is apparent that he had no intention of committing suicide, at least prior to the time he went upstairs to his room. He was cheerful all day. He was helping make his wife comfortable, getting her dinner, helping about the house, telephoning parties of the advent of the new baby, eating a hearty supper, joking with those around him, apparently joyous and happy. If preying on his mind there was an intention to commit suicide, it would have been most difficult if not impossible to have kept it from his wife. She testified that he was the same as he had always been, that he was of a sunny disposition and always congenial, and that he was cheerful and jolly that day. It is rather contrary to the nature of a man, such as the evidence shows Hatten was, under the circumstances of that day, knowing the physical suffering that his wife had been through, to have been willing to add to her burdens the shock of his killing himself. Suicide under such circumstances would have been a cowardly act, a cruel torture to the one bearing his child, not to be expected of a kind-hearted family-loving man, which evidently Hatten was. Of course, it is possible that the suicidal intent came upon him after he had gone to his room, but his life, revealed by the record, his disposition, his temperament, his affection for his family, his care for his wife in her illness, his standing in the community, would strongly tend to negative any motive for suicide.

The harsh facts tending to show suicide, such as the possession and loading of the revolver, are met somewhat by incidents disclosed in the record. Hatten was a left-handed man, and on hunting trips he shot with his left hand. What would have been the natural way for him to have shot himself? Surely not with his right hand, and holding the revolver upside down a foot from his head. Nor would it seem plausible that a man deliberately intending suicide would, with the gun 12 inches away, shoot himself in the socket of the eye. These are circumstances tending to show accidental rather than intentional shooting. Some of the circumstances, such as the cigaret still burning after his death, the evidence that he had gotten the cold cream from the bathroom, are trifles— but "trifles light as air" weigh heavily on a scale so nearly evenly balanced.

In Ætna Life Ins. Co. v. Milward, 118 Ky. 716, 82 S. W. 364, 68 L. R. A. 285, 4 Ann. Cas. 1092, the manner that a right-handed man would naturally follow if he intended to fire a fatal shot into his head is interestingly discussed by the court.

In Cochran v. Mutual Life Insurance Co. of New York (C. C.) 79 F. 46, 48, in discussing the peculiar position the party was in at the time of the shooting, the court said: "The difficulty of firing such a shot, and the uncertainty of aim which it involves, makes it improbable that such a shot was intentional."

[7] No one saw the accident. It will ever remain a mystery, and there must be more or less surmise as to how it happened. He may have thought he had unloaded the revolver but by mistake have left two loads in it. He may have been examining it and looking into it at the time of the shooting. It appears that the rachet was evidently defective. As said in Boynton v. Equitable Life Assurance Soc., 105 La. 204, 29 So. 491, 52 L. R. A. 688, "The freaks of a gun when not carefully handled are sometimes wonderful." If Hatten intended to make a complete and certain job of the matter, he would have held the gun against his head with his left hand and shot himself. That would have been the sure way for him to commit suicide. From the circumstances to which we have referred, especially the use of his right hand in firing the gun, the distance of the gun from his head, the shooting in the eye socket, the lack of motive for self-destruction, and the presumption against suicide, we are satisfied there was sufficient to make the question of accidental death one for the jury. The rule as to direction of verdicts is well established in the federal courts. Where the evidence on a fact matter is of such character that reasonable men, in an impartial and fair exercise of their judgment, may honestly reach different conclusions, the question is for the jury. Travelers' Ins. Co. of Hart-

ford v. Melick (C. C. A.) 65 F. 178, 27 L. R. A. 629; Fidelity & Casualty Co. of New York v. Love (C. C. A.) 111 F. 773; Tabor v. Mutual Life Ins. Co. of New York (C. C. A.) 13 F.(2d) 765; Grand Trunk Ry. Co. v. Ives, 144 U. S. 408, 12 S. Ct. 679, 36 L. Ed. 485.

A careful study of the evidence convinces that the trial court did not err in refusing to instruct a verdict for defendant.

The judgment is affirmed.