## NEW YORK LIFE INS. CO. v. ALMAN.

Circuit Court of Appeals, Fifth Circuit.
November 4, 1927.

Rehearing Denied December 5, 1927.

No. 5087.

1. Insurance ⟊665(6)—In action on life policy, providing reduced liability in case of suicide, evidence held consistent only with theory of suicide.

In action on life insurance policy, which provided for liability only to amount of premiums paid, if insured committed suicide within two years, evidence as to insured's death from gunshot wound *held* consistent only with theory of suicide.

2. Insurance ⟊646(7)—Insurer, attempting to establish reduced liability because of insured's self-destruction, must prove that he committed suicide.

Presumption of law is against suicide, so that burden is on insurer, attempting to establish reduced liability for self-destruction, to prove by preponderance of evidence that insured committed suicide.

**3. Insurance ⬠646(7)—Insurer's burden to prove suicide of insured, who was shot, is met by proof consistent with suicide and inconsistent with any reasonable theory of death by accident or by act of another.**

In action on life policy providing reduced liability in case of self-destruction, burden which is on insurer to prove suicide is met by proof consistent with such theory and inconsistent with any reasonable theory of death· by accident or by act of another, where insured died from gunshot wound.

**4. Evidence ⬠14—It is matter of general information that weapon fired against human body leaves powder marks only in and immediately around wound.**

It is matter of general information to those acquainted with the subject that powder marks, where they appear at all, become less in area as distance from object is decreased, and that, if weapon is fired against human body, powder marks are found only in and immediately around wound.

**5. Evidence ⬠150—Evidence of experiments in firing shotgun against cardboard and box held inadmissible, where suicide was issue.**

In action on life policy, in which question of suicide was issue, insured having been killed by shotgun, evidence of experiments made by firing gun against cardboard and box should not be admitted in evidence.

In Error to the District Court ,of the United States for the Southern District of Alabama; Robert T. Ervin, Judge.

Action by Mrs. Ahna Alman, as executrix of the estate of Sam Alman, deceased, against the New York Life Insurance Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

William McLeod and T. M. Stevens, both of Mobile, Ala. (Stevens, McCorvey, McLeod, Goode & Turner, of Mobile, Ala., on the brief), for plaintiff in error.

S. M. Johnston, of Mobile, Ala. (Gray & Dansby, of Butler, Ala., and Smiths, Young & Johnston, of Mobile, Ala., on the brief), for defendant in error.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

BRYAN, Circuit Judge. On September 16, 1924, the New York Life Insurance Company issued a policy of insurance on the life of Dr. Samuel Alman. The policy was made payable to his executor or administrator, in the sum of $5,000 upon proof of death, and in the sum of $10,000 upon proof that death resulted "from bodily injury effected solely through external, violent, and accidental cause," within a named period. In the event of self-destruction within two years, the insurance company is liable only for the amount of premiums that had been paid. It

is also provided that the double indemnity provision would not apply if the death of the insured resulted from self-destruction. The insured died on August 18 or 19, 1925, and in March of 1926 his widow, as executrix of his estate, brought this suit, and recovered judgment under the double indemnity provision for $10,000. The defense was that the insured committed suicide, and the amount of the first premium, which was all that had been paid, was tendered as the measure of liability.

[1] The only assignment of error we find it necessary to consider complains of the trial court's refusal at the close of all the evidence to direct a verdict for the defendant. Dr. Alman, the insured, was found dead in his bedroom, early in the morning of Wednesday, August 19. He was lying on his back diagonally across the bed, with a gunshot wound about an inch below his left nipple. His left foot was on the floor, and his right foot was just about touching the floor. He was in his nightshirt, and his double-barrel shotgun, with the butt on the floor near the right foot, was leaning against the left knee. The wound was covered with blood, as was a hole in the nightshirt immediately over it. There were also signs of rust on the nightshirt, indicating that the gun had slid down between the legs. An exploded shell was in the left or choke barrel of the gun. Dr. Alman's 16 year old son discovered the body, and before it was moved a number of neighbors and friends gathered and viewed it. A physician attended and probed the wound with a pair of scissors. He testified that the wound ranged upward and slightly toward the right side of the body, and was about the size of a quarter. A more thorough examination was not undertaken, and it was not shown what kind of powder or what size of shot the exploded shell contained. None of the witnesses observed any powder marks on the nightshirt, or around the wound. The nightshirt was introduced in evidence, and has been sent here as an original exhibit. However, it is of very light material, and had been washed before the trial. The hole in it is now somewhat larger than the muzzle of the gun barrel, but it is torn and frayed, and is very little, if any, larger when the frayed parts are placed back in their original position. Immediately around the hole, there yet appears to be a discoloration, such as might have been caused by powder marks. There was some testimony to the effect that the size of the wound was even larger than it was stated to be by the physician who probed it.

Two physicians testified for plaintiff, bas-

ing their testimony on their study, observation, and experience—one, that a wound inflicted by a gun held within 10 inches, but not against the body, would tend to assume the caliber of the gun; and the other, that a wound made by a gun pressed against a man's body would be the same size as the muzzle of the gun, unless the wound was enlarged by being torn. Other expert testimony was to the same effect. The results of experiments, made with small shot fired from the left barrel of Dr. Alman's gun while it was held against, and 4 inches away from, heavy cardboard, and with buckshot fired 12 feet away into a wooden box, were received in evidence for the purpose of showing the spread of the shot and the presence or absence of powder marks. The cardboard and box were admitted in evidence over defendant's objection. Two physicians testified for defendant that a shotgun held against or within a few inches of the human body would tear and break down the tissue, and thus cause the wound to be larger than the muzzle of the gun. Dr. Alman was about 6 feet in height, and weighed less than 200 pounds. The gun barrel was 28 inches in length. He kept the gun in his bedroom, where he also had a shorter barrel for it. He also kept loaded shells in a bureau drawer, and, when his body was found, that drawer was pulled out. At that time a hunting knife was on the dresser and a medicine case on a table; and an oil lamp, which it was his custom to keep lighted at night, was still burning in his room. There was no circumstance to indicate that he had been engaged in a struggle.

Dr. Alman was 53 years of age, and the only physician in Gilbertown, where he lived. He was treasurer of the church of which he was a member, and prominent in business affairs and in politics. He was highly regarded in the community, and was referred to at the trial by several witnesses as its leading citizen. He was a particular friend of A. B. Pruitt, whom he had assisted in establishing and maintaining a drug store and in being appointed state law enforcement officer, and of Mrs. Pruitt, who said that he was her family physician and "had been almost like a father" to her. On Monday afternoon, August 17, 1925, Dr. Alman was going to make some professional calls, and offered to teach Mrs. Pruitt to drive an automobile which she had recently bought. His wife was in Arkansas at the time, and her husband was in Mobile. According to Mrs. Pruitt's testimony, as she was driving along, Dr. Alman put his hand on her, and she asked him to take it off. He then said, "What difference does it make? it could be on the sly," as his wife and her husband were both away from home. She immediately drove back to Gilbertown, and, upon arriving there, told a lady friend what had occurred, and later told her mother. She saw Dr. Alman again that night at church, but he did not apologize, as she expected he would. After returning home from church, she decided to go to her husband, and on the same night, in company with a Mr. Hambrick, who boarded with her and her three children, she went in her automobile to Mobile, 100 miles away, arriving there early Tuesday morning, and told her husband of Dr. Alman's conduct.

Pruitt's testimony, stated, not literally, but in narrative form, was to the following effect:

I left Mobile Tuesday morning with my wife in an automobile and drove back to Gilbertown. When I first left Mobile, I intended to kill Dr. Alman; I had not determined to do it, but I felt like it. I left my wife at her mother's home, and drove with her father, Mr. McIlwain, to Butler, where I talked to attorneys. Mr. McIlwain and I went back to Gilbertown late in the afternoon. I left my pistol, which I carried as an enforcement officer, at a store, and went to see Dr. Alman. I talked to him in his office, and asked him why he had insulted my wife. He replied, "Pruitt, the devil got in me," and said that he ought to be killed, or ought to kill himself; that he had prayed for forgiveness, and believed God had forgiven him, but that he would not ask man to forgive him. He asked me to aid him in keeping his conduct toward my wife from becoming publicly known. I told him I could not do it; that I was not going to kill him, but that I was going to expose him. In that conversation the fact was mentioned that we were both members of the same church and several lodges. He seemed to be sorry for what he had done. As I left, I agreed to see him on the next day.

On Tuesday night, August 18, Dr. Alman was at home with a visiting tenant and two of his sons, and appeared to them, and to a neighbor who called, to be in an unworried, cheerful frame of mind. His bedroom was downstairs, on the south side of the house. His sons slept downstairs, on a sleeping porch on the north side, and the tenant in a room upstairs; but none of them heard the report of a gun during the night.

[2, 3] As the presumption of the law is against suicide, the burden was on defendant to prove by a preponderance of the evidence that Dr. Alman committed suicide. That

burden is met by proof that is consistent with the theory of suicide, and at the same time is inconsistent with any reasonable theory of death by accident or by the act of another. New York Life Insurance Co. v. Bradshaw (C. C. A.) 2 F.(2d) 457; Ætna Life Insurance Co. v. Tooley (C. C. A.) 16 F.(2d) 243. The possibility of death by accident is excluded by the nature and location of the wound. The evidence, though circumstantial, considered as a whole, and not by piecemeal, strongly supports the conclusion that Dr. Alman shot himself, and at the same time is inconsistent with the theory that he was shot by any one else. He was killed with his own gun; the drawer where he kept his shells was pulled out; and the position of his body indicates that he was sitting on the side of the bed when the shot was fired. From the nature of the wound it may safely be inferred that death was practically instantaneous.

Even in the absence of proof of motive, the circumstances in evidence would naturally lead to the conclusion that death was self-inflicted. Dr. Alman's unwillingness to face exposure of his conduct toward Mrs. Pruitt, and the obloquy that might follow, was sufficient to furnish a motive to a troubled and distracted mind, although it might not have influenced a man differently situated, or with another kind of disposition. It is most improbable that any one bent on murder would have gone into a lighted room and depended on finding a weapon of his intended victim to carry out his purpose. A stranger would not have known where to look for the gun or the shell. The upward range of the wound would indicate that it was not inflicted while the victim's body was in an upright position. If the victim was asleep in bed, and death was instantaneous, his body would not have been found with his feet on the floor. Any possible theory that Pruitt was guilty of the murder finds no support in the evidence. He quite naturally resented the insult to his wife; but, giving full effect to that circumstance, and conceding that he had a motive, yet the practicable certainty that Dr. Alman killed himself still remains.

However, plaintiff contends that it was shown by the circumstances in evidence to be impossible that Dr. Alman could have fired the fatal shot, because of the position of the gun, the range and size of the wound, and the lack of powder marks. It is not denied that he could have reached the trigger either with his hand or his foot; but it is said that, if he had done either, the gun would not have been between his legs, but would have fallen on the left of his left knee. The reason urged for this conclusion is that the physician who examined the body testified that the wound ranged, not only upward, but toward the right shoulder. Arguments of this kind have little weight, especially in the absence of a reliable examination. No definite conclusion can safely be based upon the superficial examination that was made. But, assuming that the wound ranged to the left of its entrance, such a result could have been produced by placing the butt sidewise on the floor, with the left foot over it to hold it in place, and the trigger on the side where the right foot would be. In this way the bend in the stock would throw the muzzle to the left, and, after being fired, it would naturally come to rest between the legs.

[4] It is a matter of general information to those acquainted with the subject that powder marks, where they appear at all, become less in area as the distance from the object is decreased, and that, if a weapon is fired against the human body, powder marks are found only in and immediately around the wound. It is entirely consistent with the facts in this case that the nightshirt protected the body from powder marks around the wound, and that before the shirt was washed they were on the part that is frayed and torn.

[5] In the event of another trial of this case, the evidence of the experiments made with the cardboard and the box, as well as the exhibits themselves, should not be admitted in evidence. Experiments, to be admissible in evidence, must be made under conditions practically identical with the conditions that they purport to illustrate.

It is argued that Dr. Alman could have committed suicide more conveniently with his hunting knife, or by taking poison from his medicine case. Of course, it is mere speculation to undertake to determine what induced him to adopt one method rather than another. It certainly is not unusual among suicides to accomplish death by means of firearms. We are of opinion that the evidence submitted is consistent only with the theory of suicide.

The judgment is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.