## TRAVELERS' INS. CO. OF HARTFORD, CONN., v. MILLER (two cases).

### Nos. 4767, 4768.

Circuit Court of Appeals, Seventh Circuit.
Nov. 29, 1932.

Rehearing Denied Feb. 22, 1933.

Jay Fred Reeve, Weymouth Kirkland, Edward C. Caldwell, and William H. Symmes, all of Chicago, Ill., for appellant.

John A. Bloomingston, of Chicago, Ill., for appellee.

Before EVANS and SPARKS, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

The fact background for the assigned errors may be briefly stated as follows: The deceased jumped from, or fell through, a window of his office on the twelfth floor of a large office building in Chicago, and the fall resulted in his immediate death. The only controverted issue in either case is stated by the question—Was the fall accidental? Only a friend, Adamson by name, was in the room with him at the time deceased passed through the window. On the trial this witness described the occurrence as follows:

"I was in the office of Mr. Miller the morning of his death, October 15th, 1927. It was about 10 o'clock. As I walked in the door Mr. Miller was standing at an open

window, the south window of his private office, and he was looking out of the window, and I said 'Good morning, Mr. Miller, how are you?' and Mr. Miller turned his head a bit and said 'Sick.' I said 'What is the matter?' and he said 'Oh, these damned teeth.' I said 'What is the matter with them' and by that time I had walked over along side of him and he said 'Oh, I had some more pulled yesterday. I feel faint and need the air,' and with that he closed the window and returned to his desk and I walked to the other side of the room, across from his desk, intending to sit down and pursue the course of the conversation for which I came in to see him, but rather than,—instead of sitting down he said 'Oh, hell, it is no use' and turned around and walked to the window again and threw it open and said 'I feel faint, I need the air.' I didn't sit down but just rested on the arm of the chair * * *

"Mr. Miller put his hands on the top of the glass ventilator, standing in front of the radiator, and swayed back once, and then he said 'Well, goodbye Bob' and vaulted out of the window.

"Mr. Bloomingston: Did what,—vaulted?

"The Witness: Vaulted out of the window, using the ventilator, the top of the ventilator for his leverage, and he swayed back and dove through head first, vaulted through. I don't know what the term would be best to describe it, but he went through in that manner, headfirst, and of course I ran right over there, trying to grab him, and all that I could do was just touch the calf of his leg as he went out. * * * "

There was also received in evidence a model showing the size of the window, the height of the sill above the floor, the distance of the deflector glass above the sill, the height of the window, etc., the necessary deductions from which, appellant argued, conclusively demonstrated that it was physically impossible for Miller to have accidentally fallen out of the window. A radiator stood immediately in front of the window. Set in the lower inside part of the window sill was a glass deflector, one-fourth inch thick, for use in ventilation, which deflector was broken when Miller went through the window. The broken pieces thereof fell inside "between the radiator and the wall," although parts of said deflector glass were found "sticking in the frame." The model

and the measurements are herewith reproduced.

On Adamson's cross-examination, his testimony given at the coroner's inquest was brought out. He there described the same occurrence but left out certain of the facts given on the trial which were indicative of suicide. Following is a quotation of his statement of Miller's actions:

" 'Oh, these teeth are bothering me. I had some pulled yesterday and I feel faint and sick' and he pulled up the window and stood there with a fresh strong breeze blowing in from the east, and I stood there and waited for him a moment, and he put the window back down and started back to his desk to talk to me, but apparently he felt faint again and got over towards the desk

and he said 'I am faint.' 'I will have to get the air.' He went back and pulled up the window, standing there, leaning against it, and as I recall his hand, he still held hold of the handles of the sash and I stood there for just a few seconds, I suppose, and he said 'This air feels good' and I was trying to determine in my own mind whether I would wait and finish my business conversation with him or whether he would feel more comfortable alone, and I decided I would leave, and I turned to go and as I left the office I turned around and just saw his legs disappearing through the window. Q. Was there anybody else present besides yourself, Mr. Adamson? A. No, sir. * * * Mr. Loftreck: You didn't have much of a conversation with Mr. Miller at that time? A. No, he was feeling too poorly. My presumption was that he felt faint, that he was feeling faint, and lost his balance."

He attempted to explain the discrepancies or omissions in his testimony before the coroner and that given on the trial in the following manner:[1]

Adamson was asked what he did immediately after Miller went through the win-

[1] "Mr. Reed (a close relative of deceased) asked me (that evening) to tell him what had happened and I gave him the story as I have recited it to-day, that Mr. Miller had jumped out, dived out through the window, vaulted out; and Mr. Reed then told me that was a terrible thing; that Mr. Miller's aged parents * * * were seriously ill, and that he was afraid the story of Mr. Miller's suicide might mean their death. He also explained that it was a terrible thing for Mrs. Miller and the children, and the suicide story would add to their anguish. I then asked him how about the accident, a first year life insurance, in which suicidal death might be a feature on attempted recovery, and told him that if there were to be no attempt at collection on that insurance, I would give the same story before the Coroner's inquest that I had given to the newspapers, rather than to give them the true facts.

"Mr. Reed said he assumed there would be no claim made under the first year life and accident insurance, so I told him that I would tell substantially the story that I gave before the Coroner's jury. (Following telephone conversation on Saturday night) I saw him Monday morning before the inquest. * * * I went out to the inquest then and I gave the testimony which has been previously called to my attention. * * * I went to the inquest in an automobile furnished by Mr. Reed. * * * On that Monday morning before going to the inquest, I had a conversation with Mr. Reed. * * * I asked him what the attitude was to be on these first-year life policies and the accident insurance policy, stating that I would not tell anything but the truth until I was assured that there would be no claim under those. Mr. Reed told me that he had discussed the matter with Mr. Harold Miller and Mr. Ernest Miller the day before and it was agreed that there would be no claim made under those policies.

"I told him that under such circumstances I would tell the story that I did before the Coroner's jury, but that I would never tell such a story if such claims were made under the policies."

dow. He answered that he ran out of the office, shouted, "Oh, my ———," and upon appellee's objection was not permitted to complete the sentence. Appellant offered to prove that if the witness were permitted to answer the question, he would answer, "Oh, my God, Walter Miller has just jumped out of the window." The offer was rejected, and appellant assigned error on this ruling.

[1] This statement was a part of the res gestæ and was admissible. The fact that the tense of the verb indicated a past transaction was not determinative of its admissibility as part of the res gestæ. The witness stated that he had run from the room to get downstairs to the sidewalk as soon as the body went through the window. It is hardly conceivable that more persuasive evidence could be produced. This statement was made almost instantaneously with the occurrence. The circumstances surrounding its utterance, in the presence of numerous people, made falsification or fabrication extremely improbable. Like most statements thus made, which are admissible as part of the res gestæ, it was most illuminating of the truth. If untrue, there were witnesses who would have had strong reason to dispute it. Authorities upholding the admissibility of such evidence are innumerable.[2]

The court also refused to permit Adamson to testify to a conversation which took place between himself and friends and close relatives of the deceased about twenty-five minutes after Miller died, to the effect that they agreed to give to the press a story of accidental death, and the court also ruled against appellant when it sought to interrogate Reed concerning the conversation with Adamson on the morning of the inquest in reference to Miller's death, in corroboration of Adamson's explanation of his testimony at the coroner's inquest.

We think both bits of testimony were admissible. If the statement given by Adamson on the trial of this case were true, then there existed no issue of fact for submission

[2] North American Acc. Ass'n v. Woodson, 64 F. 689 (C. C. A. 7); Standard Oil Co. of N. Y. v. Johnson, 299 F. 93 (C. C. A. 1); Kansas City So. Ry. Co. v. Clinton, 224 F. 896 (C. C. A. 8); Travelers' Insurance Co. v. Mosley, 8 Wall. 397, 19 L. Ed. 437. Other cases in which statements were held admissible as part of res gestæ although phrased in past tense are: Mason v. Dover, etc., Ry., 79 N. H. 300, 109 A. 841; Guyer v. Equitable Gas Co., 279 Pa. 5, 123 A. 590; Hedlund v. Minn. R. Co., 120 Minn. 319, 139 N. W. 603; Citizens' R. Co. v. Farley (Tex. Civ. App.) 136 S. W. 94; Beal Dry Goods Co. v. Carr, 85 Ark. 479, 108 S. W. 1053, 14 Ann. Cas. 48; Stone v. Campbells Creek R. Co., 66 W. Va. 417, 66 S. E. 521; Bessierre v. Ala. City R. Co., 179 Ala. 317, 60 So. 82; Anderson v. Lusk (Mo. App.) 202 S. W. 304.

to the jury. The only impeachment of this testimony was his statement at the inquest. At that time Adamson omitted certain incidents strongly indicative of self-destruction to which he testified on the trial as having occurred just before Miller passed through the window. Adamson's explanation was that he did not give a full and complete story at the inquest, with all the facts indicative of suicide, because he and the friends of the deceased desired to avoid the ignominy which death by suicide arouses in the minds of many. The explanation thus offered was not incredible, but its weight would have been greatly enhanced and its acceptance more likely, had Mr. Reed or some other party present testified to the same effect. The failure of the other witnesses to deny Adamson's testimony did not carry the same weight as their corroborative statement would have conveyed. The testimony was both relevant and competent.

We have carefully considered the evidence, exclusive of the rejected testimony, to ascertain whether there was any basis for a verdict in appellee's favor, only to be forced to the conclusion that there was none. The undisputed physical facts conclusively negatived appellee's theory that Miller fell through the window. The wall was 1 foot 3¾ inches thick. The external plane of the radiator was 10 inches from the wall. Miller must have stood a few inches back of the radiator. The window sill was 34¼ inches from the floor. The glass deflector arose 11⅜ inches above the window sill. To go through the window, Miller, who was 6 feet tall and weighed 190 pounds, must have passed over the top of the deflector which was about 46 inches above the floor. To get beyond the outer wall of the building, he had to go about 17 inches outwardly after going over the glass deflector. In passing through the window, Miller broke the glass deflector, and all of its broken pieces fell inside and not outside. It is evident, therefore, that he pulled the glass towards him; otherwise it would not have broken, nor would the broken pieces have fallen inside. The top of the head of a six foot man would hardly reach the outside of the wall had he merely leaned out of the window over the glass deflector. He must have jumped or thrown himself outwardly, pulling hard on the glass and causing it to break.

This is in perfect accord with the testimony of Adamson given on the trial and establishes a suicidal death. It ignores the statement Adamson attributes to the deceased, "Well, goodbye, Bob," which, of course, if accepted as true, alone would have conclusively established death by suicide.

Such weakness as appears in Adamson's testimony arises by virtue of his statement made at the coroner's inquest. Appellee did not contradict Adamson's explanation of this testimony although witnesses were present or available to challenge its veracity, if it were untrue.

We have not overlooked the fact that Miller was in the prime of life—happily married and successful. Suicide under any circumstances invites speculation as to its cause. The true explanation often is never known. Death seals the lips of the only one who knows. In controversies arising out of insurance policies after the death of the insured, courts can only view the acts of the insured at the time of his death and therefrom spell out a case of accidental or suicidal death, giving to the insured the strong presumption of an accidental cause. Impossible as it may be to locate a motive for the act, the facts here make it impossible for an impartial fact-finding tribunal to say that the death was accidental.

Judicial precedent in cases like the present is not controlling, because no two cases involve identical facts or witnesses of equal credibility or the veracity of whose testimony may be disputed, if untrue, by other witnesses. A few cases are collected here, however, which are somewhat similar,[3] all of which hold that death by suicide was conclusively established.

While this court is limited to reversing the judgment and ordering a new trial, we have felt justified in giving our views upon the evidence as presented so that in case of a retrial, the court will, if the appellee's evidence be no stronger or more persuasive than that presented by the record before us, dispose of the case as here indicated.

The judgment is reversed.

[3] Frankel v. N. Y. Life Ins. Co. (C. C. A.) 51 F. (2d) 933; Proctor v. Preferred Accident Ins. Co. (C. C. A.) 51 F.(2d) 15; Wirthlin v. Mutual Life Ins. Co. (C. C. A.) 56 F.(2d) 137; Burkett v. N. Y. Life Ins. Co. (C. C. A.) 56 F.(2d) 105; Aetna Life Ins. Co. v. Tooley (C. C. A.) 16 F.(2d) 243; N. Y. Life Ins. Co. v. Alman (C. C. A.) 22 F.(2d) 98; Planters' Bank of Tunica, Miss., v. N. Y. Life Ins. Co. (C. C. A.) 11 F.(2d) 602; New York Life Ins. Co. v. Weaver (C. C. A.) 8 F.(2d) 680; Hassencamp v. Mutual Ben. Life Ins. Co. (C. C. A.) 120 F. 475; Mutual Life Ins. Co. v. Gregg (C. C. A.) 32 F.(2d) 567.