**NEW YORK LIFE INS. CO. v. ANDERSON.**
No. 9590.

Circuit Court of Appeals, Eighth Circuit.
July 27, 1933.

M. J. Doherty, of St. Paul, Minn. (Doherty, Rumble, Bunn & Butler, of St. Paul, Minn., on the brief), for appellant.

Charles A. Lyche, of Grand Forks, N. D. (N. F. Field, of Fergus Falls, Minn., on the brief), for appellee.

Before KENYON and VAN VALKENBURGH, Circuit Judges, and DEWEY, District Judge.

DEWEY, District Judge.

The suit was brought to recover on a life insurance policy and the provisions therein for the payment of double indemnity where death results solely through accidental means; the defense, suicide.

The policy was issued to Arthur E. Anderson on April 6, 1931, and provided for payment to his wife, Stella Anderson, as beneficiary, in the sum of $2,000, and for double indemnity, or $4,000, in case death resulted from accident. The defendant relies upon a provision of the policy providing that "in the event of self-destruction during the first two insurance years, * * * the insurance under this policy shall be a sum equal to the premiums thereon which have been paid to and received by the company and no more."

The complaint alleges that on the 22d day of July, 1931, the said Arthur E. Anderson died from a gunshot wound as a result of an accident, as defined in said life insurance policy under the head "Double Indemnity." The answer admits and alleges that the said Arthur E. Anderson died on or about the 22d day of July, 1931, but that his death resulted from self-destruction. The answer alleges and the reply admits a tender to plaintiff of $29.52, the amount of the premium paid to and received by the insurance company. The trial court overruled a motion for a directed verdict in favor of the defendant made at the close of all the evidence. The case was submitted to a jury, and a verdict returned for $2,000, and judgment entered thereon in favor of the plaintiff and against the defendant. The latter, appellant here, has appealed to this court on assignments of error by the trial court, in substance, first, in refusing to admit in evidence the coroner's certificate of death of Arthur E. Anderson; second, in denying the motion made by the defendant at the close of the case for a directed verdict; third, in charging the jury that, "if the facts and circumstances established by the evidence in this case are just as consistent with the theory that Mr. Anderson was killed accidentally as they are with the theory that he killed himself, then Mrs. Anderson would be entitled to $2,000, or the face of the policy"; and, fourth, in charging the jury that "since normal men cling to life, there is the presumption that death is not the result of suicide."

The trial court was correct in refusing to admit in evidence the coroner's certificate. The statutes of Minnesota provide for the making and recording of such certificates, and provide that certified copies thereof "shall be prima facie evidence of the fact therein stated in all courts in this state." Mason's Minnesota Statutes 1927, § 5366. The Supreme Court of Minnesota, in construing this section, held that the word "fact" as used in the statute should be read "facts." In re Estate of Olson, 176 Minn. 360, 223 N. W. 677, 682. Notwithstanding this holding, the Supreme Court of Minnesota held, in Backstrom v. New York Life Ins. Co., 183 Minn. 384, 236 N. W. 708, that such a certificate was not admissible to prove a death to be suicidal on the ground that whether death was suicidal was not a "fact" within the meaning of the statute. Appellant insists that this involved a construction not only of the statute but of the certificate itself. We think the decision is a binding construction of the statute. It is well settled that under the so-called Conformity Act of Congress of September 24, 1789, c. 20, § 34 (28 USCA § 725), the competency of evidence in a civil case must be determined by the law of the state where the trial is had. Von Crome v. Travelers' Ins. Co. (C. C. A.) 11 F.(2d) 350.

As to the second assignment of error, the facts are not greatly in dispute and the law appears to be well settled governing the questions raised.

■ "The question for the reviewing court must be just the same as in any other kind of a lawsuit tried by a jury. Does the evidence, taken in the most favorable light for plaintiff, compel all reasonable men to accept the theory of suicide? If so, a verdict will be directed for defendant; otherwise not; and in this inquiry, as in every other case where the jury may rightfully refuse to accept that theory which is the natural and prima facie correct inference from all the facts, there must be some other theory fairly reconcilable with the admitted facts, and which is reasonably possible rather than merely fantastic. If all the facts indicate suicide, and there is nothing reasonably having a substantial tendency to show that the death might have occurred in any other way, the issue is one of law and not of fact." Mutual Life Ins. Co. of N. Y. v. Gregg (C. C. A.) 32 F.(2d) 567, 568.

■ There is a well-established presumption of law that death is not the result of suicide.

■ "Where the cause of one's death is unexplained or undisclosed by evidence, or where evidence tending to prove self-destruction is contradicted or impeached, or some evidence adduced is consistent with a reasonable hypothesis that the death was not self-caused, the presumption against suicide or self-destruction may prevail. But such presumption cannot properly prevail where uncontroverted evidence, whether direct or circumstantial, shows how the death was caused and that it was self-inflicted, and not by accident or the act of another." New York Life Ins. Co. v. Weaver (C. C. A.) 8 F.(2d) 680, 682; New York Life Ins. Co. v. Bradshaw (C. C. A.) 2 F.(2d) 457, 458; Mutual Life Ins. Co. v. Hatten (C. C. A.) 17 F.(2d) 889, 890; Aetna Life Ins. Co. v. Tooley (C. C. A.) 16 F.(2d) 243, 244; Mutual Life Ins. Co. v. Gregg, supra; Frankel v. New York Life Ins. Co. (C. C. A.) 51 F.(2d) 933, 935; Burkett v. New York Life Ins. Co. (C. C. A.) 56 F.(2d) 105, 107.

■■ The question then on this assignment of error, as well as on the question of whether the trial court should have given the instruction with reference to the presumption of law, of which complaint is made in the fourth assignment of error, is whether the trial court as a matter of law should have held that the evidence was not sufficient to sustain any reasonable hypothesis of death by accidental means.

The insured, Arthur E. Anderson, worked as a meat cutter for Joseph A. McGowan at East Grand Forks, Minn. Early on the morning of Wednesday, July 22, 1931, three employees at the store when they came to work found him at the farther end of a vegetable room in the basement of the store in a dying condition. There was a hole the size of a .22 bullet in his right temple about two inches above his right ear, and there were powder burns and his hair was singed around the wound about the size of a nickel. There was some blood on his clothing. He was lying on his back but a little on his right side with his head against the north wall of the room. His knees were bent just a trifle, not much, but he did not have any bend at the hips. A .22 repeating rifle was lying alongside of him on his right side and between his body and right arm. The stock of the gun was toward and about a foot from the shoulder, and the barrel pointed towards his feet. Mr. Anderson had on the regular trousers of his suit, his blue shirt, a white butcher jacket and his shoes and socks. His clothes were not ruffled or disturbed when found, and the doctor on examination did not find any other cuts or bruises on his body other than the wound in his temple. The left eye was congested and blackened, and a physician from this inferred that the bullet had taken a somewhat downward course and had lodged behind and against the left eye. Although the wound was probed, the bullet was never removed.

The gun was owned by Mr. Steen, an employee, who used it occasionally to kill hogs. It was kept on the first floor in a room back of the shop, which was called the sausage room, and was kept in a corner of the room back of a stationary kettle, where it was supported against the wall. The gun the night before was unloaded and in the place above described. The cartridges were kept on a shelf about eight feet above the floor of the room and were kept in a box in which they were purchased, and this box was kept in a cheese box on the shelf. The cartridges were known as .22 rifle long. On this morning the box of cartridges which had been kept on the shelf above was on the work bench open. A box of spices, used in making sausages, and also kept on the shelf, was on the work bench. A partly consumed bottle of milk and some crackers were found in a back room, and the keys to the store were found in the front room. Nothing about the store had been disturbed. The gun was about 40 to 42 inches

in length, but there are no measurements suggested from the trigger to the muzzle of the gun. In the gun was found an exploded shell and four cartridges.

Mr. Anderson was right-handed, was strong physically, in good health, and a good worker. He weighed about 180 pounds, was about 5 feet 8 or 9 inches tall, and never worried. He had a rather high head above the ears, an extraordinary distance one physician testified. He received $30 a week for his services. He had no financial troubles, and his wife says that his home relations were happy, that he was kind and affectionate to her and his 4 year old son. He was a member of the United Lutheran Church of Grand Forks, and went to church with his wife regularly.

The vegetable room is about 20 feet long and 4 or 4½ feet wide. There was shelving on one side of the room, two shelves running the entire length of the vegetable cellar on one side and extending out from the wall about 1½ feet. This shelving was about 2 and 3 feet from the floor and was used for vegetables. The floor was of coarse cement, but there were no bumps or raised places on it. While there were some boxes and at places some leaves on the floor, there was no indication that Mr. Anderson had slipped on the floor, and a physician testified that, if the gun was discharged and made the wound in his head where the hole appeared and extended downward to the left eye, he would slump down immediately on the floor at the place where the shot was fired.

Mr. Anderson had been drinking for two or three days before he was found in the basement, and when the employees arrived at work that morning they thought he might be in the building, and, going down to the cellar, they found the heavy wooden door to the vegetable room closed tight. It took some effort to open it. There were no windows to that room, and the only light was an electric light which turned on from the outside. This electric light was not on that morning, but was turned on by the employees before they looked into the room and found him. Mr. Anderson never hunted and had never used the gun so far as any of the employees of the store ever knew. His employer had left town about a week before and had placed Mr. Anderson in charge of the store. He had the only keys to the store room.

Mr. Steen, the owner of the gun, says that it was never kept in the basement or used therein for shooting rats, but Mrs. Anderson testified that she saw her husband on two occasions, one the Thursday before his death, carry the gun from the basement up to the back room. Her evidence as to seeing her husband bring the gun up from the basement is somewhat discredited because on direct examination she said she had never seen this gun before her husband's death and her statement about having seen him bring it up from the cellar was given in rebuttal. Mr. Steen, Mr. McGowan, and the other employees who were witnesses, testified they never knew the gun to be in the basement. Mrs. Anderson testified that she and her attorney called at the store of Mr. McGowan some time after the death of Mr. Anderson, and at that time Mr. Kipp, Mr. Parent, and Mr. Steen all told her and the attorney that the gun had been used in the basement for shooting rats on occasions. All of these witnesses, except Mr. Kipp who was not called as a witness, testified that no such statement was made and they never knew of the gun being in the basement, so that the evidence as to its ever being in the basement other than her testimony as to seeing it brought up by her husband can only be considered as affecting the credibility of the witnesses.

The one fault of Mr. Anderson as disclosed by the evidence was his use of intoxicating liquor. He drank considerably and became under the influence of liquor on occasions. His wife says that she never saw him intoxicated, and that when he was drinking he came home and went right to bed or was in bed when she came home. The proprietor, Mr. McGowan, had some trouble with him in connection with his drinking. He laid him off from work on that account about two weeks some time in 1928, and he reprimanded him and warned him about his drinking in connection with his business several times. The last time he talked to Mr. Anderson was when he came back from a trip to Boston in February, 1931. He had a talk with Mr. Anderson then and warned him to quit his drinking. He told him that if it ever occurred again he was all through with him, and Mr. Anderson promised faithfully that he would be good. Mr. McGowan left Mr. Anderson in charge of the store about a week before the latter's death, and he began the use of intoxicating liquor but was not greatly under the influence of liquor until the day before he was found in the basement of the store. He was drinking the morning of July 21st, and at noon he left the store so intoxicated that he staggered, was red in the face and bleary-eyed. One of the employees saw him at the state fair that night, and he was then intoxicated; about midnight that same night he

709

came into a restaurant and was so intoxicated that an officer told him not to try to drive his car home, and Anderson said that he was going to take a walk before he went home. Mr. Anderson from the evidence had an unusually happy disposition and was a good employee when he was not drinking, but there was a difference in his disposition when he was drinking and when he was not. When he was drinking, he was kind of ugly, and, when he was not drinking, he was just as nice as he could be. When he was drinking, he was quarrelsome and became kind of rough. When Mr. Anderson was sober, he was jolly and friendly with everybody, but just as soon as he started drinking he was quarrelsome. He picked quarrels for seemingly unnecessary reasons, and, when Mr. McGowan was away in Boston, Anderson was intoxicated out on the street, went to sleep in a car, and a policeman and others tried to wake him without success, and he stayed there most of the night. The morning after he was found in the basement, six or seven bottles of vanilla extract were found in his car together with an empty flask smelling of liquor, and the extract bottles in the store were all gone. On the morning of July 21st, a sister, Mrs. Clauson, came to visit at his home, and his wife phoned him in the morning that she was there. He had left home early on the morning of the 21st and did not return home that night at all, and the last time his wife saw him was on the morning of the 21st when he left home for work. His sister was very religious and objected to drinking, and he told one witness that his wife and his sister would both bawl him out if he went home in his then condition. His home was about four and a half blocks from the store, and he generally went home for all his meals.

There was no inquest, although the coroner made an investigation and was fully satisfied as to the cause of death, and for that reason and according to his practice he did not hold an inquest.

Mrs. Anderson testified that they had no domestic difficulties. But the evidence discloses that when he was drinking he talked about his domestic affairs. He told Mr. Steen, "Some day I will end it all," and to Mr. Parent, a friend and an employee at the store, when discussing his drinking Anderson said, "Well, then I forget my troubles." He said to Anderson: "You have no troubles. You are just kidding yourself." Anderson said, "No, I am not; I have a lot of troubles," but Anderson sat there for awhile and never said a word and started talking again, "Some day I will end it all." After Mr. McGowan

took him to task for being intoxicated while he (Mr. McGowan) was away in February, 1931, Anderson knew that, if he was found intoxicated again, he would be let off his job.

The uncontroverted evidence of circumstances under which the insured came to his death support a conclusion that it resulted from his own voluntary act. When we come to consider whether there is any evidence to support a theory or conclusion of accident, we find it very meager. His happy disposition and seemingly happly home life and enjoyment of his business and friends would have some weight were it not for the fact that, when he was drinking, he was an entirely different person with different ideas and feelings. The attorney for Mrs. Anderson suggests that Mr. Anderson was engaged in cleaning up the place to fit it for the day's business, that he discovered this rifle in the vegetable room of the basement, and that he accidentally struck it against a scantling or stumbled and accidentally discharged it in some manner. One difficulty with this argument is that there is no evidence that he was in the basement putting things in order or that he then discovered the rifle. It is purely speculative that he could have struck the gun against something in the basement that caused its discharge, as there is no evidence that there was anything in the basement that could have caused the discharge of the rifle and there is direct evidence that there was no indication of any slipping or stumbling by him therein. There is an entire absence of any evidence that would indicate that the cause of the wound on Mr. Anderson was caused by accidental means. Before there can be any room for a reasonable hypothesis of death by accident, there must be some facts and circumstances that would so indicate. To recognize these suggestions would be mere conjectures against substantial evidence of suicide. Frankel v. New York Life Ins. Co. and Burkett v. New York Life Ins. Co., both supra.

In the case of Mutual Life Ins. Co. v. Hatten, decided by this court and reported at 17 F.(2d) 889, 893, there were circumstances tending to show accidental rather than an intentional shooting. "Hatten was a left-handed man, and on hunting trips he shot with his left hand. What would have been the natural way for him to have shot himself? Surely not with his right hand, and holding the revolver upside down a foot from his head. Nor would it seem plausible that a man deliberately intending suicide would, with the gun 12 inches away, shoot himself in the socket of the eye."

The industrial commissioner found that Mr. Anderson's death was the result of suicide. Anderson v. McGowan (Minn.) 244 N. W. 816. And the verdict of the jury for $2,000 indicates that they did not believe that his death was the result of an accident. [8] The beneficiary under the policy of insurance was entitled to a presumption that death is not the result of suicide; but this presumption is one of law. It continues during the trial until overcome by evidence; when so overcome by evidence, the presumption disappears. Von Crome v. Travelers' Ins. Co. and Frankel v. New York Life Ins. Co., both supra.

The practice is well sustained of directing a verdict in favor of an insurance company when the evidence is inconsistent with any reasonable hypothesis but suicide. Frankel v. New York Life Ins. Co., supra.

 The third assignment of error attacks the following instruction of the court: "If the facts and circumstances established by the evidence in this case are just as consistent with the theory that Mr. Anderson was killed accidentally as they are with the theory that he killed himself, then Mrs. Anderson would be entitled to $2,000, or the face of the policy."

The plaintiff laid her cause of action squarely on the double indemnity provisions of the policy which provide for a recovery in case of accidental death. The defendant's answer sets up a general denial and also the affirmative defense that the cause of death was suicide occurring within two years from the date of the issuance of the policy, and that under its express terms and this situation the plaintiff could only recover the premiums paid on the policy with interest. These were the only questions at issue.

The answer to the question then as to who might prevail in the event the evidence was in equipoise must be determined by answering the question upon whom was the burden of proof.

It is well settled that, in a case on an accident policy in which there is a general denial and an affirmative defense of suicide, the burden of proof is upon the plaintiff to show from all the evidence that the death of the insured was caused by external, violent, and accidental means.

If there were facts and circumstances that indicated the death was accidental, this, aided by the presumption against self-destruction, would entitle plaintiff to recover, unless the defendant by a preponderance of the

evidence establishes its affirmative defense. If defendant was not able to meet this burden, the law would be with the plaintiff, and she would be entitled to the double indemnity. Travelers' Ins. Co. v. McConkey, 127 U. S. 661, 8 S. Ct. 1360, 32 L. Ed. 308; Burkett v. New York Life Ins. Co. (C. C. A.) 56 F.(2d) 105, 107; Love v. New York Life Ins. Co. (C. C. A.) 64 F.(2d) 829, 831.

We cannot agree with the appellee that the error was without prejudice. The judgment appealed from is reversed, and the cause remanded, with directions to grant defendant a new trial.

Reversed.