## TSCHUDI v. METROPOLITAN LIFE INS. CO.*
### No. 9827.

Circuit Court of Appeals, Eighth Circuit.
July 18, 1934.

Carl H. Lambach, of Davenport, Iowa (Kenline, Roedell, Hoffman & Tierney, of Dubuque, Iowa, on the brief), for appellant.

W. A. Smith, of Dubuque, Iowa (F. A. O'Connor, of Dubuque, Iowa, on the brief), for appellee.

Before GARDNER and WOODROUGH, Circuit Judges, and MARTINEAU, District Judge.

MARTINEAU, District Judge.

Appellant, Estelle E. Tschudi, as beneficiary, brought suit on two policies of insurance issued by appellee upon the life of her husband, Robert Tschudi. She sues to recover upon the usual double indemnity portion of said policies for the accidental death of the insured on or about the 27th day of August, 1932. At the conclusion of the testimony the learned trial judge directed a verdict in favor of the defendant, and from this action of the court the plaintiff appeals.

Appellee concedes that the policies were in full force and effect and paid their face, but denied double indemnity liability on the ground that the insured had committed suicide.

There is no substantial dispute as to the facts surrounding the death of the insured. At the time of his death he was forty-five years of age, a married man living with his family, consisting of a wife and two daughters, one aged eighteen and the other fifteen years. He had a $9,000 stock interest in a clothing store, by which he was employed. His stock was not entirely paid for, but was held in escrow while he was paying it out. He had been married to his wife for nineteen years, and during that time had been constantly employed, furnishing his family a good living. He and his family were happy and contented. His health was good, except for a slight hernia, which did not seem to trouble him much. He had an unusually happy disposition, and on the evening prior to his death was his usual self, jollying with his friends, and having a good time. His business and home were in Dubuque, Iowa. Between 5:30 and 6 o'clock in the evening of

GARDNER, Circuit Judge, dissenting.

*Rehearing denied Oct. 17, 1934.

August 26, 1932, the day prior to his death, he met an old friend and went with him to East Dubuque in a rented Ford for the purpose of collecting bills for his store. On the way they stopped at a soft drink parlor. He then talked to some people about their bills, and later had supper with three friends at Lyon's Place; the supper consisting of fish, tomatoes, and beer. Here they remained until 7:30. He ate heartily, and was in a good humor. They then returned to Dubuque, to a soft drink parlor, where he again drank beer and ate cheese sandwiches. He left this place shortly after 7:30, and returned again at 9:30, where he played cards and entertained people with card tricks; drinking beer and eating cheese sandwiches. He remained there until about 12 o'clock midnight, when he asked a friend, with whom he started out early in the evening, to call a cab, saying that he would see the circus load. Instead of going to see the circus, after riding a few blocks they went to another beer plant, where he drank beer and remained until shortly after 1 o'clock. He was then picked up by the taxi driver who had been driving him earlier in the evening, and was driven to Twenty-Fifth and Central avenue in the city of Dubuque, where he alighted from the car, as he had done many times before; his home being two doors north of this place. This was the last seen of the deceased alive. The next morning between 10:30 and 11 he was found dead in his garage.

He, his wife and their family occupied the upstairs or second story of the house located at 2512 Central avenue, and his mother-in-law and a daughter occupied the downstairs. The garage was a long frame building lying to the east of the dwelling. The dwelling and the garage extended from Central avenue on the west to White street on the east, a distance of over 200 feet. These parallel streets ran north and south, being connected by Twenty-Fifth street, running east and west. A drug store is on the northeast corner of the intersection of Central avenue and Twenty-Fifth street, and the deceased's home was in the second story of the building next north of this drug store. There is no alley in the block. The garage had five separately partitioned individual garages, extending east and west; the Tschudi garage being the center one, where his body was found, there being two other compartments to the east of it towards White street and two to the west towards the dwelling. This garage is about 60 feet north of Twenty-Fifth street, with no obstructions between. The doors of the various individual garages open to the south. A sidewalk extends along the north side of Twenty-Fifth street, on the south side of the drug store. There is also a sidewalk east of the garages on White street. The individual garage on the west end of the row is about 40 feet from the house. The Tschudi garage was practically air-tight, with no windows, except those in the doors. The doors dragged on the cement, and at the time the deceased's body was found the east door was open three or four inches. The garage was walled clear to the top with secondhand lumber. The doors were close fitting, and the windows were in perfect condition. The individual garage was 13 feet wide by 17 feet long. Plaintiff and her daughter went riding the evening before the accident, returning about 9:30, leaving the car in the yard, as she often did. The deceased had informed his wife that he would not be home that evening. She remained up until about 12:30 waiting for the elder daughter to return, sitting a part of the time on the screened porch to the rear of her flat. At the time she retired the car was still standing in the yard. Her husband would frequently drive it in the garage when he came home late. The next morning when she awoke she discovered that her husband had not returned. She then had her daughter call the store. He was not there and she called him again in about an hour. Not finding him at about 11 o'clock she started to get her car to look for him. Upon entering the garage she discovered the body of her husband.

The car was slightly to the left of the center of the garage. There was about a foot space between the rear bumper and the doors. The deceased was found upon a cushion taken from the rear seat of the car, and placed upon the floor along the east side of the car, and near the rear right wheel. The cushion was about three inches from the east wall of the garage and a foot or a foot and a half from the car. The deceased was lying on his back, with his face to the right or east, with his left leg slightly raised. The top of his head was slightly forward of the hub of the right rear wheel. His hat was on the front seat, his coat was either on the front seat or over the back of it, and his wrist watch was either strapped or buckled around the steering wheel. The ignition switch was on, and the gasoline tank was empty. There was but little gas in the tank when the plaintiff returned from her ride the evening before. The night was a warm summer night.

It is conceded that the insured died from monoxide poisoning. The garage doors

opened to the south, and there was an unobstructed view on the part of neighbors living on the south side of Twenty-Fifth street, and passersby along the street, into the garage when the doors were open.

There is no evidence showing any motive for self-destruction. The trial court was of the opinion that these facts showed conclusively that the deceased had committed suicide, and that reasonable minds could not reach a different conclusion.

Plaintiff is entitled to have the most favorable construction of which it is susceptible placed upon the evidence.

Before she can recover she must first show that deceased's death was due to external violence, and, secondly, that it was due to accidental means. The proof concededly shows that death was caused by monoxide gas. Death due to monoxide gas is by external violence. Metropolitan Life Insurance Co. v. Broyer (C. C. A.) 20 F.(2d) 818; New York Life Insurance Company v. Brown (C. C. A.) 39 F.(2d) 376. It being shown that death was due to external violence by inhaling monoxide gas, it then devolved upon plaintiff to show that the gas was not intentionally and purposely inhaled by the deceased. That burden is met by proof of death by inhaling monoxide gas, for the applicable presumption of law is that the inhaling of the gas was accidental, and death was due to accidental means. This shifted the burden to the defendant to show that the gas was intentionally and purposely inhaled. Travelers' Insurance Company v. McConkey, 127 U. S. 661, 8 S. Ct. 1360, 32 L. Ed. 308; Metropolitan Life Insurance Company v. Broyer, supra; New York Life Insurance Company v. Ross (C. C. A.) 30 F.(2d) 80.

Plaintiff was entitled to have her case go to the jury, unless the facts surrounding the death of the deceased are such as to prove conclusively that he committed suicide.

There is no direct testimony that he intentionally left his car running. There are many facts proved which, in our opinion, lead to the conclusion that he did not commit suicide. There is an entire absence of any motive for self-destruction. From 5:30 on the evening prior to his death up to 1:30 when he was last seen, he was in a good humor and was having a good time. While it is possible that the deceased committed suicide, it seems unreasonable that he would without a motive do so. His decision to sleep in his garage rather than disturb his wife and family at an unusually late hour, after having drunk beer freely to such an extent as to disclose this to his wife, was one that a reasonable man might have made. There are but few men who will, if they can avoid it, appear before their wives in an intoxicated condition, especially if they are not accustomed to doing so. To prevent such an exposure they will even do things more discomforting than sleeping on a garage floor on a car cushion. Common and general observation confirm the truth of this statement. The closing of the garage doors could have been to conceal himself from the view of the passersby.

Those who testify as to Tschudi's condition just prior to his return home say that he appeared to be sober. Where the evidence shows that a man has been repeatedly drinking beer, perhaps home-brew, from 5:30 in the afternoon to 1:30 at night, common experience compels us to the conclusion that he could not have been duly sober, although he may not have appeared to a casual observer to be drunk. Under the state of facts disclosed in this record, a jury may reasonably reach the conclusion that he drove his car into the garage, decided to sleep there for awhile, and unintentionally left the car running. The question of whether the deceased committed suicide or not should have been left to the jury.

The case is reversed and remanded.

GARDNER, Circuit Judge (dissenting).

I find myself unable to concur in the foregoing opinion. It will not be necessary to restate the facts, further than to call attention to a few additional facts which I shall take occasion to do during the course of the opinion.

As stated in the majority opinion, the plaintiff seeks to recover upon the double indemnity portion of the insurance policies issued by appellee upon the life of Robert Tschudi; it being alleged that his death resulted directly and independently of all other causes from bodily injury sustained through external, violent, and accidental means. The burden of proof was upon her not only to prove the death of the insured, but to prove that such death resulted from accidental means. Lincoln National Life Ins. Co. v. Erickson (C. C. A. 8) 42 F.(2d) 997; Love v. New York Life Ins. Co. (C. C. A. 5) 64 F.(2d) 829; New York Life Ins. Co. v. Anderson (C. C. A. 8) 66 F.(2d) 705; Burkett v. New York Life Ins. Co. (C. C. A. 5) 56 F.(2d) 105; Pilot Life Ins. Co. v. Wise (C. C. A. 5) 61 F.(2d) 481.

It is true that the presumption against suicide may aid plaintiff in sustaining the burden of showing an accidental death, yet the burden of proof is nevertheless upon her, even though the burden of the evidence may, by reason of this presumption, be shifted. The majority opinion is based wholly upon the presumption against self-destruction; but that presumption may be successfully invoked only where one comes to his death under circumstances not explained. Like other presumptions, it is not evidence, and cannot be weighed in the balance against evidence. United States v. Le Due (C. C. A. 8) 48 F. (2d) 789; Fidelity & Casualty Co. v. Niemann (C. C. A. 8) 47 F. (2d) 1056; Wirthlin v. Mutual Life Ins. Co. (C. C. A. 10) 56 F. (2d) 137, 139, 86 A. L. R. 138; Frankel v. New York Life Ins. Co. (C. C. A. 10) 51 F. (2d) 933, 935.

As said by the Circuit Court of Appeals of the Tenth Circuit in Wirthlin v. Mutual Life Insurance Company, supra, speaking through Judge Cotteral, formerly a member of this court: "It is true there is a presumption against suicide, but it is one of law, and it disappears when circumstances are adduced showing how the death occurred, and in that case the beneficiary is bound to establish that the death was accidental."

Again, in Frankel v. New York Life Insurance Company, supra, it is said: "Appellant invokes the rule that there is a presumption a death is not due to suicide but to accident, and contends that this together with the evidence required a submission of the case to the jury. The presumption is one of law. It is indulged because self-destruction is 'contrary to the general conduct of mankind; it shows gross moral turpitude in a sane person.' And a party is entitled to the benefit of the presumption, *in the absence of evidence respecting the cause of a death.* (Italics supplied.) Travelers' Ins. Co. v. McConkey, 127 U. S. 661, 8 S. Ct. 1360, 1363, 32 L. Ed. 308. But the plaintiff had the burden of proving the fact necessary to establish the liability of the insurance company, and the legal presumption that might aid her could be of value only under circumstances leaving the cause of death in doubt. Supreme Tent K. of M. v. King (C. C. A.) 142 F. 678; New York Life Ins. Co. v. Bradshaw (C. C. A.) 2 F. (2d) 457; New York Life Ins. Co. v. Weaver (C. C. A.) 8 F. (2d) 680; Mutual Life Ins. Co. v. Hatten (C. C. A.) 17 F. (2d) 889; 1 C. J. 496. As was aptly said in Von Crome v. Travelers' Ins. Co. (C. C. A.) 11 F. (2d) 350, the legal presumption disappears where there is evidence of suicide. In this case, there was an ample showing of enlightening circumstances on the subject."

Neither do I think it was incumbent upon defendant "to prove conclusively that he (insured) committed suicide." This rule, I take it, would be tantamount to a rule requiring suicide to be established beyond a reasonable doubt; but suicide may be proven, as any other fact, either by direct or circumstantial evidence. It may be established by a preponderance of direct or circumstantial evidence of sufficient weight to overcome the presumption against suicide, and it is generally held that, where circumstantial evidence is relied upon, the facts and circumstances shown must be such as to exclude any reasonable hypothesis that insured met his death by natural or accidental causes, or any other cause than that of suicide.

In considering the circumstances and the details of the evidence, it is important to have in mind another presumption, and that is that every person is presumed to intend the natural and probable consequences of his own acts. First Nat. Bank of Clarion v. Jones, 21 Wall. 325, 22 L. Ed. 542; Navassa Guano Co. v. Cockfield (C. C. A. 4) 253 F. 883, 6 A. L. R. 1168; In re Amster (D. C.) 249 F. 256; Siesseger v. Puth (Iowa) 248 N. W. 352; Peterson v. Wahlquist, 125 Neb. 247, 249 N. W. 678, 89 A. L. R. 747; John F. Jelke Co. v. Hill, 208 Wis. 650, 242 N. W. 576.

Contrary to a suggestion contained in the majority opinion, it appears from the undisputed evidence that the insured on the night preceding his death was not intoxicated. True, the evidence shows that he drank some beer, but this was extended over several hours' time, and at least one witness said he was drinking near beer. He was playing cards, and the undisputed evidence is to the effect that he was not intoxicated, nor do the circumstances indicate that he was intoxicated. He came to his home in the usual way. His wife testifies that if he did not have a car with him, he invariably took a taxi when coming home at night. His own car was standing in front of the garage where it had been left by members of the family. The admitted physical facts conclusively show that he entered the car, started it, and drove it into the garage. He then threw the shift into neutral, but left the engine running. He removed his wrist watch, fastened it to the steering wheel, placed his hat on the front seat, and his coat over the back of the front seat. He must of necessity have then gotten out of the car and

310

closed the front door. It was a hot night in August, but notwithstanding this he closed the garage door. Either before or after closing the garage door, he opened the back door of the car, removed the cushion, and closed the door, because all the doors in the car were found closed. He placed this cushion, apparently with care, next to the right hind wheel, near the exhaust pipe of the car. He then laid down with his head on the cushion and his nostrils within a few inches of the end of this exhaust pipe.

First, it should be observed that the acts performed by him do not appear to bear any evidence of intoxication. His hat was not on the garage floor, nor his coat out in the yard, nor was his watch found on the car floor, nor were the car doors left open, but every act was apparently performed with nicety, precision, and meticulous care. The evidence is undisputed that he died from monoxide poisoning, and he is presumed to have known that the natural and necessary consequences of his acts would be his death, and, if so, his death was certainly not accidental.

It is suggested that he may have felt some delicacy about waking his wife at that time of night in his then presumed intoxicated condition. I have already observed that the oral evidence was positive and undisputed that he was not intoxicated, and I have pointed out that his acts were not those of an intoxicated person; and there is no suggestion in the evidence that he ever before in his entire life slept out in the garage, or any other such place, instead of returning home as he was apparently wont to do. Again, it should be observed that this was a hot night in August, and yet the insured closed the door of this unventilated garage and lay down on the hard floor with his head next to the exhaust pipe, which was belching forth monoxide gas, intending, the majority opinion assumes, to sleep until morning. There was evidence that the door was slightly ajar, but manifestly it was his purpose to close it, but the bottom of the door dragged on the cement entrance or floor. If he was simply looking for sleeping quarters, why did he take the trouble to run the car into the garage, unless he wished it as an added convenience?

It is elementary that presumptions cannot be pyramided; that a presumption must be based upon facts, and not upon another presumption. Lincoln Nat. Life Ins. Co. v. Erickson (C. C. A. 8) 42 F.(2d) 997; Brown v. Maryland Casualty Co. (C. C. A. 8) 55 F.(2d) 159; Tucker v. Traylor Engineering & Mfg. Co. (C. C. A. 10) 48 F.(2d) 783. The

majority opinion violates this elementary rule. It is presumed, in the face of undisputed evidence and persuasive circumstances to the contrary, that the insured was intoxicated. Based upon this unwarranted presumption, it is then presumed that he did not desire to meet his wife in that condition. It is then presumed, in the face of compelling circumstances, and contrary to all human probability, that on this hot August night he closed the garage door and lay down on the cement floor with his head on the car cushion to sleep. It is also presumed, without any evidence to sustain it, direct or circumstantial, that he unintentionally left the engine of the car running, expelling monoxide gas within a few inches of his nostrils. Anyone capable of doing all the things which the insured did, without a mistake or careless act, must certainly have discovered, at least when he placed his head near the end of the exhaust pipe, that the engine of the car was running. The physical facts and surrounding circumstances conclusively and unmistakably establish that the insured committed suicide. New York Life Ins. Co. v. Anderson (C. C. A. 8) 66 F.(2d) 705; Von Crome v. Travelers' Ins. Co. (C. C. A. 8) 11 F.(2d) 350, 352; Mutual Life Ins. Co. v. Hatten (C. C. A. 8) 17 F.(2d) 889, 891; Frankel v. New York Life Ins. Co. (C. C. A. 10) 51 F.(2d) 933; Wirthlin v. Mutual Life Ins. Co. (C. C. A. 10) 56 F.(2d) 137, 86 A. L. R. 138; Burkett v. New York Life Ins. Co. (C. C. A. 5) 56 F.(2d) 105, 107; New York Life Ins. Co. v. Trimble (C. C. A. 5) 69 F.(2d) 849, 851; Travelers' Ins. Co. v. Miller (C. C. A. 7) 62 F.(2d) 910, 913; Mutual Life Ins. Co. v. Gregg (C. C. A. 6) 32 F.(2d) 567; New York Life Ins. Co. v. Ross (C. C. A. 6) 30 F.(2d) 80, 82.

In face of this positive proof explaining the cause of insured's death, the presumption against suicide cannot prevail. As said by the Circuit Court of Appeals of the Sixth Circuit in New York Life Insurance Co. v. Ross, supra: "This presumption, as such, would not survive the introduction of evidence tending to prove suicide or even motive for suicide."

In Von Crome v. Travelers' Ins. Co., supra, in reviewing circumstances surrounding the death of the insured, we said: "In the light of these facts, the conclusion of suicide is inevitable as a matter of law."

In Burkett v. New York Life Ins. Co., supra, it is said: "The burden was on the appellant to prove that the death of the insured 'resulted directly and independently of all other causes from bodily injury effected sole-

ly through external, violent and accidental means.' Evidence so far disclosed circumstances attending the death of the insured that no room was left for a reasonable hypothesis that it was caused by the act of another. The rebuttable presumption against suicide is overcome by evidence showing that the death was self-inflicted, and a finding that the death was accidental cannot properly be made where a fact or circumstance established by uncontroverted evidence is inconsistent with a reasonable hypothesis that it was due to accident."

In Mutual Life Ins. Co. v. Hatten, supra, we said: "A sane person is presumed to intend the natural consequences of his act, and, if the evidence in a case shows that a party intentionally killed himself, then, of course, the presumption against suicide vanishes."

In Frankel v. New York Life Ins. Co., supra, in discussing the presumption that death is not due to suicide, it is said: "As was aptly said in Von Crome v. Travelers' Ins. Co. (C. C. A.) 11 F.(2d) 350, the legal presumption disappears where there is evidence of suicide. In this case, there was an ample showing of enlightening circumstances on the subject."

It is also urged that no motive for self-destruction appears from the record, and it is observed in the majority opinion that defendant was married and living with his family, had purchased some interest in a clothing store by which he was employed, although his stock was not entirely paid for, was apparently living happily with his family, was in good health, and of a happy disposition. But experience shows that men do commit suicide without any disclosed motive. None appeared in New York Life Insurance Co. v. Anderson, supra. Replying to this contention in Travelers' Ins. Co. v. Miller, supra, it is said: "We have not overlooked the fact that Miller was in the prime of life—happily married and successful. Suicide under any circumstances invites speculation as to its cause. The true explanation often is never known. Death seals the lips of the only one who knows. In controversies arising out of insurance policies after the death of the insured, courts can only view the acts of the insured at the time of his death and therefrom spell out a case of accidental or suicidal death, giving to the insured the strong presumption of an accidental cause. Impossible as it may be to locate a motive for the act, the facts here make it impossible for an impartial factfinding tribunal to say that the death was accidental."

In Frankel v. New York Life Ins. Co., supra, it is said: "We have not overlooked the contention that there was evidence to support the theory of an accident, consisting of circumstances tending to show that the assured had a composed mental attitude and a motive opposed to self-destruction. But it suffices to say that they are unavailing to detract materially from the showing of undisputed facts which to any reasonable mind are little short of demonstration."

In New York Life Ins. Co. v. Trimble, supra, in disposing of the contention that no motive for suicide had been shown, the court said: "A motive for suicide is helpful to the defense but is not essential. Ætna Life Ins. Co. v. Tooley [(C. C. A.) 16 F.(2d) 243], supra, Burkett v. New York Life Ins. Co. (C. C. A.) 56 F.(2d) 105. This is so because in this life men who have no apparent motive for it do commit suicide. Perhaps always in the case of a sane person who commits suicide there is a motive; but in many cases the motive is not and possibly could not be proven. And so here we leave out of consideration any question of motive for suicide, and assume there was none. In our opinion the circumstances in this case are all consistent with the theory of suicide, and are all inconsistent with any but a fanciful theory of accident."

Verdicts must rest on fact and not on fancy; on probabilities and not on bare possibilities. The theory of accident can only be supported by piling possibility upon possibility, and by resorting to mere fancy and speculation.

I am of the view that the court properly directed a verdict for the defendant, and that the judgment appealed from should be affirmed.