## LINCOLN PETROLEUM CO. v. NEW YORK LIFE INS. CO.
### No. 7193.

Circuit Court of Appeals, Seventh Circuit.

July 23, 1940.

Rehearing Denied Oct. 9, 1940.

TREANOR, Circuit Judge, dissenting.

Louis H. Cooke, of New York City, Wm. G. Palmer and Oris Barth, both of Urbana, Ill., and Wendell J. Brown, of Chicago, Ill., for appellant.

Harold F. Lindley and Leo W. Burk, both of Danville, Ill., for appellee.

Before EVANS, SPARKS, and TREANOR, Circuit Judges.

EVANS, Circuit Judge.

Defendant appeals from a judgment based upon a verdict in plaintiff's favor. The action was predicated on two $10,000 life insurance policies running to plaintiff of which insured had been secretary and treasurer.

The chief reliance for reversal was the trial court's refusal to direct a verdict for defendant, the motion for which was predicated upon an exception to the general death liability clause. The exception covered the case where an insured met his death through "self destruction" "whether the insured be sane or insane" within two years of the issuance of the policy. Defendant claims that suicide was conclusively shown. Other errors assigned relate to evidence, instructions, and refusal of the court to set aside the verdict.

The evidence of eyewitnesses who described the insured's fall from the fourth floor window, was free from uncertainty or dispute. It and other undisputed evidence disclosed the following situation:

Deceased was 36 years of age at the time of his death. He had been married only a few months. His financial condition was good; he received a salary of $2,000 a month. He was a petroleum engineer, a geologist, a university graduate. He was said to be in good health and in good spirits. Also it was said, and we so assume, he was happily married. He was a man of six feet in height, weighing about 180 pounds, and was described as awkward in movement.

Concerning his doings on the day he died, the testimony is detailed and uncontradicted. It shows he had been drinking heavily and was intoxicated. He and his wife and several others were to meet, and did meet, at a night club, "Lou's Rendezvous," near Mattoon, Illinois, for dinner. Deceased drank more at the bar and returned to his table where he had words with his wife.

He was evidently angry because his wife had danced with another guest at the party. He became enraged and threw his steak at her. She left the tavern alone and drove to their cottage, where she took a bag of clothes, and went to a hotel in the town.

Her husband left the club with a friend who was "staying" with them and they went to his cottage and to sleep. The wife decided to phone a mutual friend, who got in touch with her husband, and they all met in the friend's room. There was more drinking there. The wife left and, accompanied by one of the party, went first to a tavern and then to her aforementioned hotel room. On the way they encountered her husband who went with them. The friend urged him to leave his wife until the next morning when they could "talk things over." The husband said he would leave, but asked to speak to his wife alone for a moment. The friend left, but remained in the vicinity of the hotel.

The wife testified that her husband became abusive, slapping her several times, and thereupon she concluded that he was too drunk to reason with, so she decided to scare him. She climbed onto the window sill of her fourth floor room, and in turning, slipped. She grabbed the sill where she clung for a few seconds. Her husband approached her, she says, to aid her, and touched her, but she slipped and

fell to the pavement. She lit on her feet, was badly injured, but miraculously escaped death, survived and testified on the trial.

Her story of the events immediately preceding deceased's fall is fully corroborated by the testimony of cab drivers and the friend who accompanied the couple to the hotel. They not only told of Mrs. Lake's fall, but told what followed immediately thereafter when insured came through the window and fell to the sidewalk head first and was killed. These witnesses [1] were about a block from the hotel when they heard a woman scream, and ran to the scene. They saw the wife on the window sill, and then saw her slip and fall. She lay on the ground, dead or fatally injured, as they believed. One of the drivers said he turned her over to see if she were dead and discovered she was not.

Another driver said he saw the insured leaning out of the window, his chest on the sill, and his head and shoulders extending about a foot past the window. The driver shouted to the insured to get back, but he replied by swearing and added, "Down I come." The taxi driver shouted at him again, and yelled at the other driver to get out of the way. The various drivers described the deceased's action as "inching" his way, "edging" his way, over the sill. [2] They agree, and there is no dispute from any source, that his reply to their

[1] *Taxi Driver Isbel.*

"Q. Now, Mr. Isbel, did you observe anything else there after this woman come through the window and fell on the sidewalk? A. *Yes, there was a man leaning out of the window.*

"Q. Which window? A. The same window.

"Q. Describe his position in that window? A. *He was leaning out as though he was raising his body—on his chest, and he had his arms bent back.*

"Q. *Holding on the windowsill!* A. Yes, sir.

"Q. What was he doing? A. *He seemed to be edging himself across the sill.*

"Q. Toward the outside of the window? A. The upper part of his body, from about here up, was sticking out the window, and looking down.

"Q. Now, how long after Mrs. Lake came through the window, was it that you saw this man edge his way across the sill? A. Long enough for me to holler that 'this woman isn't dead; get an ambulance' and I looked up and saw him and I yelled 'For Christ's sake, get back in there' and he leaned out and made some smutty remark; I said 'for Christ's sake, get back in there' and he just kept looking down; I repeated again—I said 'get back in there' and he said 'f—k you, down I come'.

"Q. And did he come through the window? A. Absolutely, right on his head. As he came out, his left foot, I think it was, caught that screen and pulled it down.

"Q. Now, how long an interval of time was there between the time that Mrs. Lake came down, and this man came down? A. In my estimation, *it must have been two minutes*—right at that.

"Q. There was an appreciable period of time between the two? A. There was.

"Q. Was Mrs. Lake's body already on the sidewalk when you saw Lake with his chest on the sill? A. Oh, yes.

"Q. Of course, you were somewhat excited and yelling and in a hurry, weren't you? A. I was very excited, but I don't believe there was any hurry, because I was trying to persuade him to get back in the window.

"Q. You called to him just as you saw him coming out? A. *I called to him twice.*

"Q. When you first saw him, how far out the window was he? A. *Just barely his shoulders and head out.*

"Q. Were his head and shoulders out of the window at that time? A. At that time where you could see them.

"Q. That is the first time you saw him and he had his head and shoulders out the window? A. Yes, sir.

"Q. Could you see his hands? A. No, sir.

"Q. You don't know whether he was holding on or not? A. No.

"Q. You don't know what he was doing? A. He was standing up there and hollering down a few times.

"Q. Calling? A. It sounded like he said 'Maxine' three times.

"Q. When he called her name, did he have his head and shoulders out of the window? A. Yes, leaning over, to look down.

"Q. Leaning over and looking down? A. Yes, in about the position you would be in a window upstairs."

[2] *Taxi Driver Leonard.*

"Q. Then, Mr. Leonard, after she struck the pavement, what did you next see or hear? A. I heard the voice of one of the boys who had run down there, holler for him to stay up there.

"Q. What boys? A. The driver, Mr. Isbel, and the other boy—I just can't call his name.

shouted urge to get back was, "Down I come" and "here I come." Of this significant statement there is neither doubt nor uncertainty.

The interim between the wife's fall and the deceased's fall was variously estimated as from thirty seconds to three and a half minutes.

Both insured and his wife fell on a cement sidewalk beneath the window. Had the taxicab drivers not rolled the wife's body away, insured would have lit on her. The window was 42 feet 10 inches above the cement sidewalk.

A chart of the room and the window showed that there was a radiator a foot wide and 1.5 feet high in front of the window. The sill was 2.9 feet above the floor, and was 1.66 feet thick. The thickness of the building wall does not appear.

Plaintiff points to the absence of motive for committing suicide. Defendant answers by pointing to the fact that the insured had ample motive when he saw his wife's body on the pavement, he having been the cause of her fall, which appeared to be a death-producing one.

Plaintiff, in support of its view that there was sufficient evidence to take the case to the jury, stresses the following: Insured was young, healthy, and happily married; he had abundant financial resources; he and his wife were planning to build a home. Emphasis is placed on the fact that the deceased was intoxicated, and also, even when sober, was very awkward in his movements, so that when he leaned over the window sill to see the results of his wife's fall, he was leaning too far out and became unbalanced and toppled over. Moreover it is asserted he descended head first, with his arms at his side. One witness states the deceased's fall occurred but a very few moments after his wife's, from which it is inferred that he had no time to contemplate his action.

On the hard, factual, determinative question, disinterested witnesses testified to facts which are explainable only on the theory of suicide. From the figures disclosed by the chart, and calculations we have made therefrom, it appears that 5.16 [3] feet of deceased's six foot stature was taken in leaning out of the window, without

"Q. Mr. Lineberry? A. Yes, sir.

"Q. What did you hear them say? A. 'Stay up there for God's sake,' or 'for God's sake, stay up there'; * * *

"Q. Was somebody in the window when they said that? A. *Somebody was leaning out the window.*

"Q. Was it a man or a woman? A. Apparently, it would be a man.

"Q. How much of his body could you see? A. *Not much; his shoulders and head.*

"Q. Did he reply anything to what was said to him? A. I was so far away, I could not be positive of the words he said, any more than '*here I come.*'

"Q. You heard him say that? Did you know he said something else? A. Something else was said but I would not be positive of it, before that, but everything was confusion.

"Q. That something else, was something said by him? A. Yes, sir.

"Q. As you saw him there, with his shoulders in the window, just describe what his position was, when you first saw him. A. It seemed as though, to me, from where I was and at that distance, *he was edging his way over the ledge of* the window, preparing to come down.

"Q. Did you see his hands? A. No, I could not see his hands.

"Q. He did come down, did he? A. Yes, sir.

"Q. How did he come down? A. He came down, head first.

"Q. He struck on the sidewalk below the hotel room? A. Yes, sir.

"Q. And he just gradually came out the window? A. That is right, yes.

"Q. When he fell, he lit on his head? A. Yes, sir.

"Q. And you think it wasn't over a minute from the time you first saw him until he fell? A. From the time I first saw him until he came out the window, it could not be much over a minute. He no more got through calling her name than he started down.

"Q. I don't understand you. A. *At the time he stopped calling the name 'Maxine,' he started inching himself out the window.*

"Q. And he called that name two or three times? A. Yes, sir.

"Q. Just the name 'Maxine'? A. Yes, sir. If he said anything more than that, I didn't hear it."

[3] 1.5 feet — radiator height.
1.96 feet — hypotenuse of right triangle.
1.7 feet — width of sill.

5.16 feet

considering the thickness of the building wall, which thickness was not given. This calculation would tally with the taxi drivers' testimony which was to the effect that deceased's head extended a foot from the window. Such being the case, the conclusion seems hard to avoid, that deceased, in order to fall, had to pull or push himself up ("edge" or "inch" himself, as the drivers testified) over the window sill in order to "fall" out of the window.

Our belief that suicide was the motive and was conclusively established is based on the undisputed fact that deceased had just witnessed the fall of his wife, for which he realized he was to blame and was directly responsible. In the realization of this fact may be found the motive for his suicide. Whether his mind was cleared by the shocking and sobering spectacle he had just witnessed or whether his drunken condition still clogged his mental faculties is immaterial for the exception to insurance liability in each policy covered "self destruction," "whether sane or insane." Avoidance of this exception is not shown either by the action of one mentally perplexed to the point of insanity or by the less disturbed but nevertheless highly confused mental state of one who is badly intoxicated. A fair construction of this exception ·clause necessitates a reasonable application to facts. Courts are not justified in holding that it applies to self-destruction by one who is insane, but does not cover self-destruction by one who is drunk, but whose drunken mental state does not reach the point of alcoholic insanity.

We cannot, of course, view the record as a trier of fact. We are reviewing the action of the triers of fact. All reasonable inferences and the weight to be given them, we must and do accord to the plaintiff, for the jury doubtless so found in reaching its verdict. There remains the question,—Was there proof sufficient to support a finding that insured's death was not occasioned by self-destruction? In other words has defendant *conclusively* shown that death was due to self-destruction?

We think it has.

What insured said to the men on the ground as he edged himself out leaves us free from doubt. His action alone might have left us a little less certain. But his action was accompanied by his words. The drunken man was sobered by the realization that he had caused his wife to fall from the window to what he believed was certain death. He looked out the window and there on the sidewalk he saw her limp and apparently lifeless form. Remorse impelled him to meet his responsibility then and there. He must have realized he would be crushed on the pavement should he fall head foremost, but he pulled himself up and out the window. To the frantic appeals of the men on the street he replied twice, "Down I come." No doubt about his words—or their meaning. He came down, head first, from the fourth floor window to the cement walk. In so doing, he met his death. It was "self-destruction." An impartial appraisal of his act and deed makes it impossible for us to conclude otherwise. His action in pushing himself head first to a fall which of necessity would be fatal is too clear to permit a contrary finding to stand. His spoken words and his accompanying action negative any rational theory of accident. They evidence conscious and understanding appreciation of his contemplated action. They impel us to but one rational conclusion—self-destruction.

Cases arising out of suicide clauses in insurance policies might be cited without end. We content ourselves with but one, which was twice before this court, Travelers ·Ins. Co. v. Miller, 7 Cir., 62 F.2d 910; Miller v. Travelers Ins. Co., 7 Cir., 80 F.2d 503.

The judgment is reversed, with direction to grant a new trial.

TREANOR, Circuit Judge (dissenting).

I am convinced that the evidence presented a question of fact which the District Court was bound by law to submit to the jury. The District Court stated the question to the jury as follows: "Did the man who was killed have an intention in his mind, an impulse, while rational or irrational, while drunk or while sober, to take his own life, and thereby takes it, or did his death come about by an accident?"

The liability exemption clause in the insurance policy in question does not relieve from liability for the death of an insured who does an unreasonable or foolish act

which causes his death. Unless the act is done by the insured for the purpose of causing his death it is not a case of self-destruction within the meaning of the clause. Furthermore, the insurer's liability is not qualified by the fact that an insured's death results from an unreasonable or foolish act committed while under the influence of intoxicating liquor or while suffering from great mental or emotional shock.

Without attempting to discuss in detail the testimony of the witnesses I desire to call special attention to the testimony of Mrs. Lake and of witness Malcolm. They were in a position to have very definite and clear impressions of the events respecting which they testified; and if the jury believed their testimony such belief must have thrown considerable doubt upon the accuracy of the testimony of other witnesses whose testimony was vital to the defendant's case, and must have affected the credibility of these witnesses.

Mr. Malcolm was in the room with Mr. and Mrs. Lake just prior to the events in question; and after an ineffectual effort to get Mr. Lake to go home, he left the room and went to a point directly across the street from the hotel. He saw Mrs. Lake come to the window and seat herself upon the sill; he saw her slip and fall from the window. He ran into the hotel and requested someone to call an ambulance and ran back to the point below the window, where he saw Mr. Lake already lying on the sidewalk. Mr. Malcolm testified that the total time consumed in going into the hotel and returning to the scene of the accident "could not have been over thirty seconds." He also testified that when he returned there were only two persons there, "a policeman coming from the east" and "a small man with a white shirt" who was coming from the west, "running east."

Mrs. Lake testified that her husband was "very, very drunk," and that she "could not reason with him at all." She also testified that he slapped her and that she "stepped upon the window sill and put both feet out"; that she told her husband that if he did not stop she was going to jump. She further testified that as she "was sitting on the sill" she turned back into the room to speak to her husband. She became aware that she was slipping and grabbed the window sill. As she was hanging, still clutching the window sill, her husband came to her and attempted to keep her from falling.

In addition to the testimony of Malcolm, which has been referred to above, he also testified that when he saw Mrs. Lake turn "around in the window, on the sill" he called to her: "Maxine, get back in there, you're going to fall out."

The jury found as a fact that Mr. Lake accidentally fell from the window and did not intentionally force, or throw himself out, with the intention of causing his death. Consequently, the jury was convinced either that Lake, while attempting to save his wife, leaned so far out of the window that he lost his balance and started to fall at almost the very instant that his wife slipped from his grasp, or that he pushed himself farther out of the window in an effort to see the result of his wife's fall and then lost his balance and crashed to the pavement.

The general tenor of the testimony of defense witnesses is that Lake was pulling, or "edging himself" across the window sill. But defendant's witnesses also testified that while Lake was leaning out of the window and pulling, or "edging himself" across the window sill he had his "arms bent back" and was "holding on the window sill." Also one of defendant's witnesses testified that as Lake was falling "he had his hands to his sides and came down straight, head first." The position of Lake with "his arms bent back" and "holding on the window sill" while "edging himself" across the window sill obviously is as consistent with the inference that he was attempting to avoid falling as it is with the inference that he was making a frantic effort to force himself out of the window for the purpose of committing suicide. Defendant's witnesses leave no doubt that in using the descriptive words "edging himself" across the window sill they intend to convey the impression that the edging across was for the purpose of reaching a point where he would fall from the window. But the movement described as "edging" reasonably could have been the gradual slipping of Lake during the last stages of his effort to hold on to the window sill and thereby stop the momentum of his forward movement out of the window. In view of the physical

facts it would have been so easy for the deceased to have plunged from the window that it is not difficult to understand that the jury might have concluded that if Lake had desired to take his life he would have followed the obviously simple method of merely allowing himself to fall out of the window instead of, as the defense witnesses describe it, "edging himself across the window sill." There was a radiator in front of the window 1' 6" high, and the window sill was slightly less than 1' 6" from the top of the radiator. If the deceased had stepped upon the radiator his knees would have been higher than the edge of the window sill. If from such position Lake had leaned out of the window it would have required no effort to have plunged through the window to the pavement below. Furthermore, the radiator was only approximately 9½" in length, and the window was approximately 38½" in width; consequently, there was ample space for the deceased to have leaned out of the window on either side of the radiator. The window sill was approximately 2' 11" from the floor, and since Lake was 6' 1" tall, the upper portion of his body extended 3' 2" above the window sill. It would seem reasonable that a man of his height, standing on the floor of the room, could have forced himself out of the window easily and quickly, if he were intending to kill himself.

The foregoing physical facts also furnish strong justification for the belief of the jury that the deceased accidentally fell from the window.

The majority opinion places special emphasis on the testimony of witnesses who testified that just before Lake fell he used the words "I am coming down." Witness Isbel testified that Lake used the words "down I come"; witness Leonard testified that the words were "here I come"; and witness Lineberry testified that the words were "I am coming down." Isbel testified that Lake's remark was in response to Isbel's warning to Lake to "Get back." Lineberry testified that the remark was in response to his exclamation "Get back in there, you son of a bitch"; and witness Leonard testified that Lake's remark was in response to the exclamations of Lineberry and Isbel, which exclamations, according to Leonard's testimony, were substantially the same, but neither was the one that Lineberry testified that he actually used. Also, witness Isbel testified that the words that Mr. Lake used, after he, Isbel, told him to "get back there" were used only once.

If the jury believed the testimony of Malcolm and Mrs. Lake there was much in the testimony of defense witnesses which was necessarily inaccurate and improbable. The jury could not reconcile the testimony of defense witnesses as to the time elapsing between the fall of Mrs. Lake and that of Mr. Lake with the testimony of Malcolm. Malcolm testified that not more than 30 seconds of time elapsed from the instant that Mrs. Lake struck the pavement until he saw Mr. Lake lying there. Defense witnesses fixed the time from two minutes to "3 or 3½ minutes." If the jury accepted as accurate Malcolm's estimate of "not more than 30 seconds" it must have discounted the dependability of the recollection of the other witnesses not only as to the time involved, but also as to the dramatic details which according to their testimony consumed from 2 to 3 or 3½ minutes.

In view of the uncertainty which appears in the testimony respecting the remarks which were attributed to Mr. Lake we cannot say, as a matter of law, that the jury was required to believe that Lake made the remarks which were attributed to him; and certainly we cannot say as a matter of law that he used the exact words which were attributed to him. Witness Buckner testified that he "heard Isbel say to Lineberry, 'Look out, he is coming too.'" Witness Lineberry testified that he "heard Don Isbel say, 'My God, get out of the way, here comes a man.'" The jury might have believed that the witnesses, even though honest, were mistakenly attributing to the deceased exclamations of others.

But granting that the deceased exclaimed "down I come", I do not understand how this court can say that such words, used under the circumstances, express, as a matter of law, an intention or purpose on the part of the deceased to take his own life, in the face of other circumstances from which the jury reasonably could have inferred that Lake's fall was purely accidental. In view of Lake's mental and

emotional condition, it is probable that the sudden realization that he was falling to certain death would not have produced the same shock that it would have produced if he had been in a normal condition; and it is understandable that he felt neither anguish nor regret at the prospect of his own death. And if Lake used some such expression as is attributed to him by witnesses, the jury reasonably could have found in the expression merely an indication of the deceased's lack of concern for his own life and not a disclosure of a purpose to take his own life. Undoubtedly the jury was justified in concluding that if Lake used the language attributed to him, he used it at a moment when he knew it had become physically impossible for him to avoid falling to the pavement below; and if the jury believed, as it reasonably could have under the testimony, that Lake had lost his balance accidentally and was falling from the window and that the exclamation came at a time when he was helpless to avoid plunging to the pavement, it was not important to the jury what Lake actually meant by the words used. But granting that it was material, it is a hopeless quest on the part of this court to try to determine the meaning which Lake intended to convey by the words attributed to him, in view of the circumstances under which they were used. Furthermore, I think that it is a clear invasion of the power and duty of the jury and of the District Court for us to place our interpretation on the supposed statement of Lake since it is not clear from the evidence just what words he did use and since the jury might have found that he did not use any words substantially equivalent to the words attributed to him.

My purpose in discussing the factual circumstances is solely to justify my belief that the evidence presented a substantial, if narrow, question of fact for the jury; and I believe that the trial court correctly held that it was bound by the law to leave that narrow question of fact to the jury; and I further believe that for us to disturb the verdict of the jury and the judgment of the District Court based thereon requires us to disregard the dividing line which the law establishes between the power and function of trial courts and courts of review.